## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
### Case No. _____

| | |
|---|---|
| **OSCAR JULIEN-RIOU,** | ) |
| Plaintiff, | ) |
| vs. | ) |
| **IOANNYS LLANES,** in his Individual Capacity; | ) |
| **CITY OF MIAMI POLICE DEPARTMENT** | ) |
| [Jorge Colina, in his capacity as Chief of Police for the City of Miami]; | ) |
| **CITY OF MIAMI;** | ) |
| [Francis Suarez, in his capacity of Mayor of the City of Miami]; and | ) |
| **MIAMI-DADE COUNTY** | ) |
| [Carlos A. Gimenez, in his capacity of Mayor of Miami-Dade County], | ) |
| Defendants. | ) |
| _____/ | ) |

## PLAINTIFF'S COMPLAINT AND DEMAND FOR JURY TRIAL

**COMES NOW** Plaintiff**, OSCAR JULIEN-RIOU** (hereinafter "MR. RIOU"), by and through the undersigned attorney, and hereby files this Complaint against IOANNYS LLANES (hereinafter "LLANES"), in his Individual Capacity, for acts that occurred during the course and scope of his employment with Defendant, CITY OF MIAMI POLICE DEPARTMENT [Jorge Colina, in his capacity as Police Chief for the City of Miami Police Department] (hereinafter "MIAMI PD") and Defendants CITY OF MIAMI [Francis Suarez, in his capacity as Mayor of the City of Miami] (hereinafter "CITY OF MIAMI") and MIAMI-DADE COUNTY [Carlos A. Gimenez, in his capacity as Mayor of Miami-Dade County] (hereinafter "MIAMI-DADE COUNTY") for breaching its duty to warn and provide notice of park hours as required by law causing and resulting in LLANES' unlawful arrest, battery, and injury of/to  MR. RIOU.

1

## **INTRODUCTION**

This civil action arises from an incident that occurred at approximately 7 PM on December 10, 2018, during the wrongful arrest of Plaintiff MR. RIOU after he complied with LLANES' unlawful order to leave an open public park that LLANES stated was closed. MR. RIOU lived across the street from this park in Miami (Alonzo Kelly Park) and was sitting alone on the park bench not bothering anyone.  LLANES without cause, unlawfully, and in deprivation of MR. RIOU'S civil rights falsely arrested, battered, falsely imprisoned, maliciously prosecuted, and deprived/violated other civil rights of MR. RIOU.  MR. RIOU is a retired Veteran who had recently retired from the V.A. as a Registered Nurse after 20 years, subsequent to retiring from the Army after 20 years of service. He volunteers at the V.A. playing the piano for Veterans in palliative care.  He'd never been arrested in his 63 years of life. Defendant LLANES used unreasonable and excessive force against Plaintiff MR. RIOU when he forcibly pushed/threw him down to the concrete, manhandled him in such a way as to cause physical injury, searched him without consent, called other officers to the scene to physically apply unreasonable and excessive force in reliance on his call, forcibly put him in handcuffs when he was already under the physical control of the Defendant, detained him for over an hour, and created a criminal record for MR. RIOU by falsely charging him with resisting arrest

Plaintiff MR. RIOU brings federal constitutional claims against Defendant LLANES, in his individual capacity, for committing acts under color of law that deprived Plaintiff of his rights under the Constitution and the laws of the State of Florida by using excessive and unreasonable force against Plaintiff during his wrongful arrest, handcuffing, and detention. Further, Plaintiff brings federal constitutional claims against MIAMI PD as the supervisory entity responsible for the conduct, training, and supervision of the Officers under its charge. MIAMI PD failed to properly train and supervise its Officers in the appropriate methods, proper procedures, and protocols with respect to the use of force when conducting an

2

arrest, when appearing on the scene in response to an arrest, and investigating arrests by its

Officers.  MAIMI PD has a proven pattern of excessive force (whether deadly or non-deadly or

with/without weapon discharge), negligent training and supervision, and inadequate and

unreasonably  delayed internal investigations, and is currently under U.S. Department of  Justice

(hereinafter "DOJ") monitoring and/or oversight for such pattern and practices.  Miami  PD's

policy, Custom, and willful lack of holding LLANES accountable while investigating MR.

RIOU'S 03/28/19 complaint filed with Internal Affairs and being under active DOJ oversight

constituted deliberate indifference to Plaintiff's constitutional rights and the laws of the State of

Florida, resulting in the use of excessive and unreasonable force during the Plaintiff's wrongful

arrest, handcuffing, and detention. Plaintiff brings a negligent supervision claim against MIAMI

PD for not only retaining Defendant LLANES and failing to stop the unlawful conduct

of LLANES on the scene on 12/10/18, but also as of today (05/23/19) not even having placed

LLANES on Administrative leave (paid or unpaid) while it investigates this matter or to meet its

duty of protecting the public from further excessive and unreasonable force by LLANES, and

having purposefully delayed investigating this matter despite MR. RIOU having filed an official

written complaint against LLANES with Internal Affairs on 03/28/19.  Plaintiff also brings

additional charges against Miami PD for the acts and/or conduct of its employee LLANES

committed during the scope of his employment.


Plaintiff MR. RIOU brings federal constitutional claims against Defendants CITY OF

MIAMI and MIAMI-DADE COUNTY for its negligence which placed MR. RIOU at risk of

harm wherein he suffered actual physical and mental harm and arrest because their breach of

duty gave rise to and caused Defendants LLANES and MIAMI PD to commit acts under

color of law that deprived Plaintiff of his rights under the Constitution and the laws of the State

of Florida through excessive and unreasonable force against Plaintiff during his wrongful arrest,

handcuffing, and detention.  CITY OF MIAMI and MIAMI-DADE COUNTY share concurrent

and/or supplemental jurisdiction over this MIAMI-DADE COUNTY public park located in

Miami including jurisdiction for enforcement by MIAMI PD.  Both CITY OF MIAMI and

MIAMI-DADE COUNTY failed to meet their duty to post operational hours at the park, thereby

3

aiding and fostering LLANES deprivation of MR. RIOU'S civil rights where LLANES as law enforcement for the MIAMI PD misused his authority and created false pretext to approach MR. RIOU under the guise of the park being closed, to which MR. RIOU had no notice of arbitrary/different hours from both the city and county parks he visited almost daily when planning his next career steps/meditating which had signs posted of hours of 7 AM – 10 PM or *closed* 10PM – 6 AM, to exercise his right to timely remain in or leave the park to avoid fines, engagement, false arrest, and/or entrapment by law enforcement.  LLANES, MIAMI PD, CITY OF MIAMI and MIAMI-DADE COUNTY individually and collectively breached its duty to warn causing and resulting in the deprivation of MR. RIOU's civil rights and actual harm in a manner exhibiting wanton and willful disregard of human rights, safety, or property.

After giving 20 years of his life to serve our country, MR. RIOU was violated and deprived of his civil rights by those sworn to protect and serve. He was stripped of his humanity and dignity, overwhelmingly suffering by what was done to him. He feared for his life, stating *"They descended on me like S.W.A.T.! I was thinking they could kill me and my children would never know what happened to me."*

## JURISDICTION AND VENUE

1. Plaintiff MR. RIOU seeks relief under the Civil Rights Act of 1871, 42 U.S.C. § 1983, and the Fourth and Fourteenth Amendments of the United States Constitution, including compensatory damages, punitive damages, costs, and attorney's fees, pursuant to 42 U.S.C. §1988 and the Americans with Disability Act ("ADA") pursuant to 28 U.S.C. § 1331.

2. This Court has federal question jurisdiction over Plaintiff's federal law claims pursuant to 28 U.S.C. §§ 1331, 1343(a)(3). Plaintiff's state law claims are related to thesefederal claims and form a part of the same case or controversy. The Court accordingly has supplemental jurisdiction over Plaintiff's state law claims, pursuant to 28 U.S.C. § 1367(a).

3.  Venue is proper in the Southern District Court of Florida pursuant to 28 U.S.C. §1391(b) as Plaintiff and all Defendants work and/or reside in this District, and all acts and omissions giving rise to this action occurred in this District.

4.  All conditions precedent to the maintenance of this action, including those set forth in Florida Statute § 768.28, have occurred, been performed, or waived prior to its institution.

## **PARTIES**

5.  During all times material hereto, Plaintiff MR. RIOU was a resident of Miami-Dade County, Florida, and is otherwise sui juris. MR. RIOU is a 63- year-old male who enlisted in the Army as a Private/E-3 medic and earned academic degrees in Nursing, first earning his Licensed Practical Nurse (L.P.N.) license and subsequently his Bachelor's degree and Registered Nurse (R.N.) license, and earning his commission as an Officer in the military, retiring from the Army as an Officer/O-3.  Subsequently, he worked another 20 years at the V.A. as a R.N. and then retired.  At the time of this incident on 12/10/18, he had just retired from the V.A. a few months earlier.

6.  During all times material hereto, Defendant LLANES was employed as a sworn law enforcement officer/police (hereinafter "OFFICER(S)") for Defendant MIAMI PD and was acting under the control, direction, and supervision of the MIAMI PD, in such capacity as an agent, servant, and/or employee.  Upon information and belief, and at all times material hereto, Defendant LLANES participated in the unconstitutional violations and other wrongful acts that occurred on December 10, 2018 at approximately 7 PM, at which time he was acting in the course and scope of his employment under color of state law.  LLANES is and was a resident of the State of Florida and is otherwise sui juris.

7.  During all times material hereto, Defendant MIAMI PD [Jorge Colina, in his capacity as Chief of the Miami Police Department] is an entity corporate and political, duly organized under the laws of the State of Florida. MIAMI PD is the governmental entity responsible, as a matter of law, for the actions of its officials, agents, and employees, and was responsible for their training, supervision, and conduct. MIAMI PD is also responsible for ensuring that its police personnel obey the laws of the State of Florida and ensuring that its rules and regulations are followed and enforced.  MIAMI PD is located in the city of Miami, FL.

8. During all times material hereto, Defendant CITY OF MIAMI [Francis Suarez, in his official capacity as Mayor] is an entity corporate and political, duly organized under the laws of the State of Florida.  CITY OF MIAMI is a municipality and/or governmental entity responsible, as a matter of law, for the actions of its official, agents, and employees, has concurrent and/or supplemental jurisdiction over Alonzo Kelly Park with MIAMI-DADE COUNTY, and was responsible for the oversight, regulation, and posting notice of hours in Alonzo Kelly Park in Miami in a location clearly visible to users of the park, including responsibility for posting hours of operation in plain sight so as to give notice to park visitors.  CITY OF MIAMI is located in the state of Florida.

9. During all times material hereto, Defendant MIAMI-DADE COUNTY [Carlos A. Gimenez, in his official capacity as Mayor of Miami-Dade County ] is an entity corporate and political, duly organized under the laws of the State of Florida.  MIAMI-DADE COUNTY is a municipality and/or governmental entity responsible, as a matter of law, for the actions of its official, agents, and employees, has concurrent and/or supplemental jurisdiction over Alonzo Kelly Park with CITY OF MIAMI, and was responsible for the oversight, regulation, and posting notice of hours for the public Alonzo Kelly Park in Miami in a location clearly visible to users of the park, including responsibility for posting hours of operation in plain sight so as to give notice to park visitors.  MIAMI-DADE COUNTY is located in the state of Florida.

10. Plaintiff MR. RIOU sues Defendant LLANES in his individual capacity.

11. Plaintiff MR. RIOU sues Defendant MIAMI PD [Jorge Colina, in his capacity as Chief of the Miami Police Department].

12. Plaintiff MR. RIOU sues Defendant CITY OF MIAMI [Francis Suarez, in his capacity as Mayor of Miami].

13. Plaintiff MR. RIOU dues Defendant MIAMI-DADE COUNTY [Carlos A. Gimenez, in his capacity as Mayor of Miami-Dade County].

## STATEMENT OF THE FACTS

14. The events giving rise to this action occurred on December 10, 2018.

6

15. Plaintiff MR. RIOU lived across the street from Alonzo Kelly Park in Miami on 12/10/18.  It is a public park located in Defendant CITY OF MIAMI, operated by Defendant MIAMI-DADE COUNTY per the sign at the park, and policed by MIAMI PD.  Defendant LLANES arrested MR. RIOU at the park.  LLANES works for Defendant MIAMI PD.   CITY OF MIAMI, MIAMI-DADE COUNTY, and MIAMI PD have concurrent and/or supplemental jurisdiction over this park.

16. MR. RIOU has since moved after LLANES' unlawful conduct against him.

17. MR. RIOU had recently retired from his second retirement, working as a Registered Nurse employed by the V.A.   Previously, he'd retired from the Army after serving our country for 20 years.  He'd worked his way from an enlisted Private/E-3 Medic to earning his Nursing degrees and licensure first as a Licensed Practical Nurse (L.P.N.), then a Registered Nurse (R.N.), and earned his commission as an Army Officer, retiring as an Officer/O-3.

18. He was also a Minister, sitting in the park meditating and dictating to himself with his camera akin to video journaling as he planned the next phase of his life entering full-time ministry and playing music.  He visited that park almost daily, as well as other parks throughout the city and county.

19. He is also a self-taught pianist who volunteers at the VA playing the piano for Veterans in palliative care.  The VA wrote a feature article about his service playing the piano for veterans.

20. Having completed two retirements, he was 63 years old.

21. He'd never been arrested in his life.

22. On 12/10/18, as usual, MR. RIOU was sitting alone on the park bench at Alonzo Kelly Park across the street from home, meditating and dictating with his camera.

23. The entire park is just one small square with a few concrete benches turned inward. There's no playground equipment or other machinery obstructing view.  As a matter of fact, one has an unobstructed view of the entire park from any park bench.

24. Defendant OFFICER LLANES approached MR. RIOU. It was approximately 7 PM.

25. LLANES was employed by MIAMI PD at this time on 12/10/18.

26. He was acting within the scope of his employment.

27. Because MR. RIOU was openly and visibly video-journaling/recording when LLANES approached, his camera recorded the incident.

28. LLANES told MR. RIOU to leave the park because it was allegedly "closed."

29. No sign was posted anywhere in Alonzo Kelly Park providing notice or warning of park hours as required by law.  **EXHIBIT A.** CITY OF MIAMI'S public parks are open from 7AM – 10 PM per City ordinance and customary posted signs.  MIAMI-DADE COUNTY'S park hours vary per park-- including in conflict with County ordinance, as show in another MIAMI-DADE COUNTY park MR. RIOU visited where the hours listed on the posted county welcome sign are  " PARK CLOSED FROM 10:00 PM TO 6:00 AM," (meaning it's open from 6:01 AM to 9:59 PM). However, the County's website states open hours as 10 AM to 6 PM.  Defendants CITY OF MIAMI, MIAMI-DADE COUNTY, and MIAMI PD all exercise concurrent and/or supplemental jurisdiction over this park.

30. As MR. RIOU's video shows, LLANES sat in his police car shining his light on MR. RIOU for approximately 6 minutes before approaching, so he knew MR. RIOU was sitting there alone and was not a threat.

31. Ironically, MR. RIOU didn't have any fear when he saw LLANES, commenting to himself that "Miami PD" was "*on the job*" when he first saw the police car.

32. MR. RIOU complied with LLANES' order to leave, responding "*Yes Sir*."

8

33. MR. RIOU did not flee.

34. Despite MR. RIOU'S compliance with LLANES' unlawful order to leave the open public park, LLANES grabbed him and threw him down on the concrete ground, yelling "you threw something on the ground."

35. LLANES manhandled MR. RIOU, even to the point of MR. RIOU crying out in pain that LLANES was hurting MR. RIOU'S back.

36. LLANES searched MR. RIOU without consent.

37. LLANES' search yielded no positive results.

38. LLANES called other OFFICERS to the scene. In his police report, LLANES identified them as OFFICERS Hernandez and Perez. These OFFICERS were employed by MIAMI PD at the time of the arrest on 12/10/18 and acting within the scope of their employment.

39. At some point during this incident, LLANES and/or the other OFFICERS handcuffed MR. RIOU.

40. At some point during this incident, LLANES and/or the other OFFICERS physically placed MR. RIOU in the back of one of the police cars and detained him.

41. At some point during this incident, LLANES and/or the other OFFICERS deployed the dog/K-9 to perform a search.

42. The dog found nothing, i.e., "*yielded negative results*" per LLANES' police report.

43. However, LLANES still arrested MR. RIOU, documenting "Defendant arrested."

9

44. At some point during this incident, an OFFICER who identified himself as a Supervisor physically presented himself on the scene to MR. RIOU and the other OFFICERS. He was employed by MIAMI PD at that time on 12/10/18 and acting within the scope of his employment.

45. MR. RIOU was still handcuffed and detained in the back of the police car at this point.

46. At some point during this incident, that Supervisor directed the OFFICERS to un-handcuff MR. RIOU but did not release MR. RIOU from custody.  One OFFICER unhandcuffed MR. RIOU but then re-handcuffed MR. RIOU, stating he didn't feel safe with MR. RIOU being unhandcuffed.

47. LLANES and MIAMI PD detained MR. RIOU handcuffed for over an hour.

48. LLANES and MIAMI PD detained MR. RIOU in their physical custody for over an hour.

49. At some point during this incident, LLANES charged MR. RIOU with resisting arrest.

50. LLANES prefaced his police report of MR. RIOU'S arrest as the park being a well-known drug area, which multiple Courts across Districts have held does not give rise to probable cause, despite noting that MR. RIOU was sitting on the park bench before LLANES approached him.

51. The Supervising MIAMI PD OFFICER did not utilize his capacity nor authority to direct LLANES or the other OFFICERS to release MR. RIOU from custody and allow MR. RIOU to leave during this time.

52. MIAMI PD has a use of force policy.

53. Later in December, 2018, MR. RIOU came to see undersigned Attorney regarding this tragic incident.  Having never been arrested, he didn't realize that an active criminal case against him existed.  After reading LLANES' report, Undersigned informed MR. RIOU of the criminal case and showed him the case in the court's online docket.

54. MR. RIOU was so afraid LLANES and MIAMI PD would fabricate evidence or take further false action against him, that he wanted to clear his criminal case before filing a complaint.

55. Undersigned was retained to represent MR. RIOU in the criminal case.  MR. RIOU entered a plea of Not Guilty and demanded a Jury Trial.  Trial was scheduled for February 25, 2019.

56. Undersigned Defense Counsel made the Prosecutor aware of MR. RIOU's video of the 12/10/18 arrest pursuant to Discovery.

57. On or about 02/18/19, the Prosecutor viewed MR. RIOU'S video in Undersigned's presence.  The Prosecutor stated LLANES lacked probable cause for the arrest and dropped the charge, final approval granted by his superior in the State Attorney's Office.

58. The charge was officially dropped/nolle pross'ed in Court on the day of Trial, 02/25/19, almost three months after LLANES arrested MR. RIOU. **EXHIBIT B.**

59. MR. RIOU was so traumatized by LLANES and MIAMI PD'S actions that he did not appear with Undersigned Counsel on 02/25/19 to hear the Prosecutor officially drop the charge.

60. Conerning LLANES' and MIAMI PD'S actions against him, MR. RIOU stated "*I was scared for my life…They descended on me like S.W.A.T.! I was thinking they could kill me and my children would never know what happened to me.*"

61. On 03/28/19, MR RIOU filed a written complaint against LLANES with Internal Affairs of the MIAMI PD through undersigned attorney. **EXHIBIT C.**

62. Internal Affairs didn't contact MR. RIOU/undersigned to follow-up until over a week later on 04/09/19 to say it was now "processing the complaint."

11

63. At the time of that call, MIAMI PD had not placed LLANES on Leave (paid or otherwise) nor removed him from working and/or patrolling the streets or exercising jurisdiction and/or ability to engage and/or arrest the public.

64. From their 04/09/19 call until almost a month later on 04/24/19, neither Internal Affairs of MIAMI PD nor anyone else from MAIMI PD contacted MR. RIOU/undersigned or responded to undersigned's two separate calls on 04/10/19 and 04/12/19 regarding the complaint.

65. MAIMI PD still did not place LLANES on leave during that time.

66. On 04/24/19, Undersigned called Internal Affairs for the third time regarding the complaint. At that time, Internal Affairs of MIAMI PD responded that the complaint had been assigned to an Investigator.

67. Internal Affairs confirmed that the State Attorney's Office had opened an investigation against LLANES based on the complaint.

68. It also confirmed that MIAMI PD had not placed LLANES on Leave nor removed him from working and/or patrolling the streets or exercising jurisdiction and/or ability to engage and/or arrest the public.

69. For the first time since Undersigned filed the complaint on 03/28/19 and made multiple calls to Internal Affairs, it requested to see MR. RIOU'S video of the arrest listed as available evidence on his 03/28/19 complaint and aired on multiple television news broadcasts in the area. Per the conversation on that day, a copy was delivered on Monday, 05/06/19 when Undersigned returned from emergency sick leave which she'd be on for a week including when taking IA's return call at home.

70. To date (05/23/19), despite two active investigations in Internal Affairs and the Miami-Dade State Attorney's Office; almost two months since MR. RIOU's complaint was filed; almost two months of Undersigned and MR. RIOU attempting to work with MIAMI PD in good faith by following-up multiple times and humbly giving unmerited time for MIAMI PD to show it even intended to operate in good faith; almost two months since MR. RIOU's video of the arrest was aired on multiple television stations multiple times in Miami; and over five months since the arrest wherein MIAMI PD supervisors were present; MIAMI PD still has not placed LLANES on Leave nor even removed him

from working and/or patrolling the streets or exercising jurisdiction and/or ability to engage and/or arrest the public.

71. MIAMI PD is arbitrarily inconsistent in its applications of its policies, practices, and customs, sometimes relieving Officers of duty on the same day as a complaint of excessive force, while other times leaving officers who are the subjects of excessive force complaints on duty without direct supervisory oversight until investigations are closed to police and arrest the public.

72. MIAMI PD is currently under DOJ oversight and/or monitoring for its patterns and practices, including excessive force, delaying internal investigations for year, and failure to adequately train or supervise its Officers. **EXHIBIT D.**

73. MR. RIOU has suffered great loss of dignity, as well as humiliation and fear as a result of all Defendant's conduct.

74. MR. RIOU now has a criminal record due to the conduct of all Defendants.

75. MR. RIOU was so traumatized and humiliated by LLANES and MIAMI PD'S conduct that he didn't even attend to hear the Prosecutor officially finally drop the charge against him.

76. MR. RIOU was so traumatized by LLANES' and MIAMI PD'S conduct that he has since moved from where he previously lived across the street from Alonzo Kelly Park.

77. MR. RIOU was so traumatized by LLANES' and MIAMI PD'S conduct that he no longer visits Alonzo Kelly Park, a park he previously visited almost every evening.

78. MR. RIOU experienced and still experiences physical pain as a result of LLANES' and MIAMI PD'S conduct.

79. MR. RIOU experienced and still experiences severe anxiety, fear, and recurrent nightmares as a result of LLANES' and MIAMI PD'S conduct.

13

80. MR. RIOU is now receiving therapy and psychiatric care due to the trauma and stress caused by LLANES' and MIAMI PD'S conduct.

81. MR. RIOU is now taking multiple medications due to the physical, psychological, and mental trauma and stress caused by LLANES' and MIAMI PD'S conduct.

82. MR. RIOU suffered financial loss due to all Defendant's conduct.

83. MR. RIOU now fears retaliation, harassment, and future unlawful arrests as a result of LLANES' and MIAMI PD'S conduct.

### COUNT I
### 42 U.S.C. § 1983 – Excessive Use of Force By Defendant LLANES

84. Plaintiff MR. RIOU realleges the allegations contained in Paragraphs 1 through 83 as if fully set forth herein.

85. The force used by Defendant LLANES against MR. RIOU during his arrest of MR. RIOU was objectively inhumane, unnecessary, and constituted the unreasonable and excessive use of force in violation of MR. RIOU'S clearly established constitutional rights under the Fourth and Fourteenth Amendments and 42 U.S.C. § 1983.

86. LLANES used unreasonable and excessive force against MR. RIOU when, with a depraved indifference to human life and conscious disregard for the safety of the general public, LLANES forcibly pushed/threw MR. RIOU down to the concrete, even with MR. RIOU crying out in pain and informing LLANES that he was hurting MR. RIOU'S back, and forcibly put MR. RIOU in handcuffs when he was already under the physical control of LLANES and/or other OFFICERS whom LLANES called to the scene.

87. LLANES committed the acts described hereinabove in a gross disregard of MR. RIOU'S constitutional rights while acting under color of law, and specifically deprived Plaintiff of

his constitutional right to be free from excessive police force under the Fourth Amendment.

88. LLANES induced and called other OFFICER(S) to the scene to assist and further his violation of MR. RIOU'S civil rights and to apply unreasonable and excessive force against MR. RIOU.

89. As a direct result of Defendant LLANES's outrageous conduct, Plaintiff MR. RIOU experienced and still experiences loss of dignity, back pain, headaches, anxiety, recurrent nightmares, and required and still requires medical care, new medications, psychiatric/mental health counseling, and has physically relocated from the area of Alonzo Kelly park.

90. As a further direct and proximate result of Defendant LLANES' conduct, Plaintiff MR. RIOU suffered unlawful arrest and detention, loss of his liberty and freedom, bodily injury and resulting pain and suffering, severe mental anguish, and medical expenses for treatment and care. These losses are either permanent or continuing, and MR. RIOU will suffer the losses in the future, in violation of his civil rights. MR. RIOU has also agreed to pay the undersigned a reasonable attorney fee for services provided.

91. WHEREFORE, Plaintiff MR. RIOU prays for the following relief:
   A.   Public apology from Defendant LLANES;
   B.   Immediate expungement of his criminal record created as a result of LLANES' unlawful arrest;
   C.   Trial by Jury;
   D.   Judgment for compensatory damages in excess of $100,000.00;
   E.   Judgment for exemplary or punitive damages;
   F.   Cost of suit;
   G.   Recovery of Attorney fees pursuant to 42 U.S.C. § 1983;
   H.   Any other such relief as this Honorable Court deems just and proper

## COUNT II

### 42 U.S.C. § 1983 - Deliberate Indifference by Defendant LLANES

92. Plaintiff MR. RIOU realleges the allegations contained in Paragraphs 1 through 83 as if fully set forth herein.

93. Defendant LLANES violated MR. RIOU'S Fourth Amendment rights by failing to reasonably respond to individuals that are non-threatening and by inappropriately responding to non-threatening situations with excessive force.

94. LLANES knew or should have known that MR. RIOU was non-threatening because he observed MR RIOU for several minutes sitting alone on the park bench not bothering before approaching MR. RIOU.

95. LLANES knew or should have known that MR. RIOU was non-threatening when MR. RIOU politely responded "Yes Sir" to LLANES' order to leave the park.

96. LLANES knew or should have known that MR. RIOU was non-threatening when MR. RIOU complied with LLANES' order to leave the park.

97. LLANES knew or should have known that MR. RIOU was non-threatening when MR. RIOU did not take flight when LLANES approached nor in attempting to leaving the park.

98. LLANES knew or should have known that any use of force was objectively unreasonable in light of the totality of the circumstances.

99. The force used by LLANES against MR. RIOU during his arrest was objectively inhumane, unnecessary, and constituted the unreasonable and excessive use of force, in violation of MR. RIOU'S clearly established constitutional rights under the Fourth and Fourteenth Amendments and 42 U.S.C. § 1983.

100.     At no time was MR RIOU under suspicion of committing any crime.

101.     At no time did he pose any threat of violence to LLANES.

102.     Yet, LLANES called other OFFICERS to the scene to further violate MR. RIOU'S constitutional rights.

103.     Despite both the human and K-9 OFFICER'S unlawful searches failing to yield positive results, LLANES, alone and/or with the assistance of non-supervisory OFFICERS he induced, still handcuffed MR. RIOU, placed him in the back of a police car, detained him for over an hour, completed and filed a police report against MR. RIOU, charged MR. RIOU with resisting arrest, allowed formal charges to be filed

16

against MR. RIOU by the Prosecutor without curing LLANES unlawful conduct, allowed the criminal case to proceed all the way to the Trial date wherein LLANES had been subpoenaed without intervening to cure his unlawful arrest and deprivation of MR. RIOU'S rights.

104.    Had MR. RIOU not retained (Undersigned) Counsel to defend him in the criminal case caused by LLANES' conduct, it is reasonably foreseeable that LLANES would have fully participated in, testified at trial, facilitated, and caused, MR. RIOU to suffer incarceration when MR. RIOU had never been arrested in his 63 years of life.

105.    As a result of the outrageous conduct of Defendant LLANES, Plaintiff MR. RIOU experienced and still experiences loss of dignity, back pain, headaches, anxiety, recurrent nightmares, and required and still requires medical care, new medications, psychiatric/mental health counseling, and has physically relocated from the area of Alonzo Kelly park.

106.    As a further direct and proximate result of Defendant LLANES' conduct, Plaintiff MR. RIOU suffered unlawful arrest and detention, loss of his liberty and freedom, bodily injury and resulting pain and suffering, severe mental anguish, and medical expenses for treatment and care. These losses are either permanent or continuing, and MR. RIOU will suffer the losses in the future, in violation of his civil rights. MR. RIOU has also agreed to pay the undersigned a reasonable attorney fee for services provided.

107.    WHEREFORE, Plaintiff MR. RIOU prays for the following relief:
   A.    Public apology from Defendant LLANES;
   B.    Immediate expungement of his criminal record created as a result of LLANES' unlawful arrest;
   C.    Trial by Jury;
   D.    Judgment for compensatory damages in excess of $100,000.00;
   E.    Judgment for exemplary or punitive damages;
   F.    Cost of suit;
   G.    Recovery of Attorney fees pursuant to 42 U.S.C. § 1983;
   H.    Any other such relief as this Honorable Court deems just and proper

## COUNT III
## 42 U.S.C. § 1983 - Deliberate Indifference by Defendant MIAMI PD [Jorge Colina in his capacity as Chief of Police of the City of Miami Police Department]

108.     Plaintiff MR. RIOU realleges the allegations contained in Paragraphs 1 through 83 as if fully set forth herein.

109.     Defendant MIAMI PD [Jorge Colina in his capacity as Chief of Police of the City of Miami Police Department] violated MR. RIOU'S Fourth Amendment rights by failing to train its deputies to reasonably respond to individuals that are non-threatening and by engaging in policies and practices that caused constitutional violations to people that are non-threatening by inappropriately responding to non-threatening situations with excessive force.

110.     MIAMI PD Chief Jorge Colina commands the Miami Police Department.  He oversees Field Operations, Criminal Investigations, Administration Divisions, and Internal Affairs. He formulates departmental procedures, directs agency activities, and develops short and long range departmental strategic goals.

111.     These constitutional violations were caused by MIAMI PD's lack of training and supervision regarding OFFICERS having the ability and knowledge to appropriately interact with non-threatening people who they arrest without causing physical injury.

112.     Defendant LLANES knew or should have known that MR. RIOU was non-threatening, and he should have known that any use of force was objectively unreasonable in light of the totality of the circumstances.

113.     The force used by LLANES and the other MIAMI PD OFFICERS against MR. RIOU during his arrest was objectively inhumane, unnecessary, and constituted the unreasonable and excessive use of force, in violation of MR. RIOU's clearly established constitutional rights under the Fourth and Fourteenth Amendments and 42 U.S.C. § 1983.

114.     At no time was MR. RIOU under suspicion of committing any crime.

115.     At no time did he pose any threat of violence to any Defendant LLANES or the responding OFFICERS.

116.     MIAMI PD ratified LLANES' and other OFFICER'S conduct by not ensuring that OFFICERS permanently unhandcuffed MR. RIOU when a Supervising OFFICER presented to MR. RIOU on the scene of the 12/10/18 arrest, despite both human and K-9 OFFICERS having found no contraband on MR. RIOU through their search or the search conducted by their dog/K-9, and where no probable cause existed nor underlying offense existed for the search or to charge MR. RIOU with resisting arrest.

18

117.    MIAMI PD ratified LLANES' and other OFFICER'S conduct by choosing to continue physically detaining MR. RIOU in police custody for over an hour  when a Supervising OFFICER presented to MR. RIOU on the scene of the 12/10/18 arrest, despite both human and K-9 OFFICERS having found no contraband on MR. RIOU through their search or the search conducted by their dog/K-9, and where no probable cause existed nor underlying offense existed for the search or to charge MR. RIOU with resisting arrest.

118.    MIAMI PD ratified LLANES' and other OFFICER'S conduct by choosing to complete and file/submit a police report to the State Attorney's Office/Prosecutor to cause filing of a criminal charge against MR. RIOU when a Supervising OFFICER presented to MR. RIOU on the scene of the 12/10/18 arrest, despite both human and K-9 OFFICERS having found no contraband on MR. RIOU through their search or the search conducted by their dog/K-9, and where no probable cause existed nor underlying offense existed for the search or to charge MR. RIOU with resisting arrest.

119.    IAMI PD ratified LLANES' and other OFFICER'S conduct by refusing to protect the public by refusing to place LLANES on leave during its instant Internal Affairs investigation of LLANES from MR. RIOU'S official written complaint filed 03/28/19, despite a Supervising OFFICER having appeared on the scene of the 12/10/18 arrest; despite both human and K-9 OFFICERS having found no contraband on MR. RIOU through their search or the search conducted by their dog/K-9; despite being under DOJ oversight; and where no probable cause existed nor underlying offense existed for the search or to charge MR. RIOU with resisting arrest; and despite it having previously placed OFFICERS on leave immediately/on the same day of a complaint regarding excessive force even if Internal Affairs and/or the State Attorney's Office had not concluded its investigation nor charged the Officer.  To date, MIAMI PD employs LLANES to continue working and patrolling communities and/or the public, giving him license to continue his infringement and deprivation of civil rights under the color of law of those he encounters.

120.    MIAMI PD ratified LLANES and other OFFICER'S conduct and violated MR. RIOU's constitutional rights by failing to reign in rogue officers, creating an atmosphere that caused OFFICERS to feel they have license to use excessive force.

121.    As a result of the outrageous conduct of Defendant MIAMI PD, Plaintiff MR. RIOU experienced and still experiences loss of dignity, back pain, headaches, anxiety, recurrent nightmares, and required and still requires medical care, new medications, psychiatric/mental health counseling, and has physically relocated from the area of Alonzo Kelly park.

122.      As a further direct and proximate result of Defendant MIAMI PD'S conduct, Plaintiff MR. RIOU suffered unlawful arrest and detention, loss of his liberty and freedom, bodily injury and resulting pain and suffering, extreme mental anguish, and medical expenses for treatment and care. These losses are either permanent or continuing, and MR. RIOU will suffer the losses in the future, in violation of his civil rights. MR. RIOU has also agreed to pay the undersigned a reasonable attorney fee for services provided.

123.      WHEREFORE, Plaintiff MR. RIOU prays for the following relief:
   A.      Public apology from Defendant MIAMI PD;
   B.      Immediate expungement of his criminal record created as a result of LLANES' unlawful arrest;
   C.      Trial by Jury;
   D.      Judgment for compensatory damages in excess of $100,000.00;
   E.      Judgment for exemplary or punitive damages;
   F.      Cost of suit;
   G.      Recovery of Attorney fees pursuant to 42 U.S.C. § 1983;
   H.      Any other such relief as this Honorable Court deems just and proper.


## COUNT IV
## BATTERY AGAINST DEFENDANT LLANES


124.      Plaintiff MR RIOU realleges the allegations contained in Paragraphs 1 through 83 as if fully set forth herein.

125.      Defendant LLANES' conduct against MR. RIOU, when he used unreasonable and excessive force to push/throw MR. RIOU down to the concrete pavement and put him in handcuffs, with a depraved indifference to human life and conscious disregard for the safety of the general public, constituted an intentional unwelcome and unprivileged touching of MR. RIOU, and was undertaken in bad faith and with actual malice and caused bodily harm.


126.      As a result of the outrageous conduct of Defendant LLANES, Plaintiff MR. RIOU experienced and still experiences loss of dignity, back pain, headaches, anxiety, recurrent nightmares, and required and still requires medical care, new medications, psychiatric/mental health counseling, and has physically relocated from the area of Alonzo Kelly park.

127.      As a further direct and proximate result of Defendant LLANES' conduct, Plaintiff MR. RIOU suffered unlawful arrest and detention, loss of his liberty and freedom, bodily

injury and resulting pain and suffering, extreme mental anguish, and medical expenses for treatment and care. These losses are either permanent or continuing, and MR. RIOU will suffer the losses in the future, in violation of his civil rights. MR. RIOU has also agreed to pay the undersigned a reasonable attorney fee for services provided.

128.      WHEREFORE, Plaintiff MR. RIOU prays for the following relief:
   A.      Public apology from Defendant LLANES;
   B.      Immediate expungement of his criminal record created as a result of LLANES' unlawful arrest;
   C.      Trial by Jury;
   D.      Judgment for compensatory damages in excess of $100,000.00;
   E.      Judgment for exemplary or punitive damages;
   F.      Cost of suit;
   G.      Recovery of Attorney fees pursuant to 42 U.S.C. § 1983;
   H.      Any other such relief as this Honorable Court deems just and proper

## COUNT V
## BATTERY AGAINST DEFENDANT MIAMI PD [Jorge Colina in his capacity as Chief of Police of the City of Miami Police Department]

129.      Plaintiff MR RIOU realleges the allegations contained in Paragraphs 1 through 83 as if fully set forth herein.

130.      Defendant's LLANES' conduct against MR. RIOU, when he used unreasonable and excessive force to push and/or throw MR. RIOU down to the concrete pavement and put him in handcuffs, constituted an intentional unwelcome and unprivileged touching of MR RIOU.

131.      LLANES was acting within the scope of his employment with MIAMI PD.

132.      MIAMI PD ratified LLANES' conduct as within the scope of his employment and acceptable conduct for the MIAMI PD when the supervising OFFICER who appeared on the scene on the active arrest on 12/10/18 failed to intervene or stop LLANES' unlawful conduct and that of the other OFFICERS; but instead allowed LLANES to detain MR. RIOU, handcuffed and in the back of a police car, for over an hour; allowed and/or directed LLANES to draft/complete and submit/file a police report against MR. RIOU charging MR. RIOU with a crime, and thereby furthering formal criminal proceeding

against MR. RIOU to commence based on LLANES' unlawful conduct; and failing to intervene after formal charges were filed.

133.     MIAMI PD ratified LLANES' conduct as within the scope of his employment and acceptable conduct for the MIAMI PD by refusing to place LLANES on leave after this incident for which its supervising OFFICER had actual knowledge prior to MR. RIOU'S 03/28/19 complaint; and continuing to refuse to place LLANES on leave after the complaint to date.

134.     MIAMI PD ratified LLANES and other OFFICER'S conduct and violated MR. RIOU's constitutional rights by failing to reign in rogue officers, creating an atmosphere that caused OFFICERS to feel they have license to use excessive force.

135.     As a result of the outrageous conduct of Defendant MIAMI PD, Plaintiff MR. RIOU experienced and still experiences loss of dignity, back pain, headaches, anxiety, recurrent nightmares, and required and still requires medical care, new medications, psychiatric/mental health counseling, and has physically relocated from the area of Alonzo Kelly park.

136.     As a further direct and proximate result of Defendant MIAMI PD'S conduct, Plaintiff MR. RIOU suffered unlawful arrest and detention, loss of his liberty and freedom, bodily injury and resulting pain and suffering, extreme mental anguish, and medical expenses for treatment and care. These losses are either permanent or continuing, and MR. RIOU will suffer the losses in the future, in violation of his civil rights. MR. RIOU has also agreed to pay the undersigned a reasonable attorney fee for services provided.

137.     WHEREFORE, Plaintiff MR. RIOU prays for the following relief:
   A.     Public apology from Defendant MIAMI PD;
   B.     Immediate expungement of his criminal record created as a result of LLANES' unlawful arrest;
   C.     Trial by Jury;
   D.     Judgment for compensatory damages in excess of $100,000.00;
   E.     Judgment for exemplary or punitive damages;
   F.     Cost of suit;
   G.     Recovery of Attorney fees pursuant to 42 U.S.C. § 1983;
   H.     Any other such relief as this Honorable Court deems just and proper

22

## COUNT VI

## 42 U.S.C. . § 1983 FALSE ARREST/FALSE IMPRISONMENT CLAIM AGAINST DEFENDENAT LLANES

138.     Plaintiff MR. RIOU re-alleges the allegations contained in Paragraphs 1 through 83 as if fully set forth herein.

139.     As set forth above, through his direct actions, Defendant LLANES personally participated in and caused the illegal search, false arrest, and false imprisonment of MR. RIOU.

140.     LLANES lacked probable cause for both the search and arrest of MR. RIOU.

141.     MR. had not committed a crime.

142.     MR. RIOU was not a felon.

143.     MR. RIOU complied with LLANES' order to leave the park.

144.     MR. RIOU did not flee when LLANES approached him.

145.     LLANES observed MR. RIOU for several minutes prior to approaching him and saw MR. RIOU sitting alone on the park bench not bothering anyone nor being a threat to anyone.

146.     Neither the search by the human OFFICERS or dog/K-9 OFFICER yielded any positive results.

147.     LLANES lacked legal authority to arrest or detain MR. RIOU pursuant to his false arrest, handcuffing and detaining  MR. RIOU  for over an hour confined in the back seat of a police car, restricting MR. RIOU'S liberty, freedom, and movements, despite both searches by human OFFICERS and K-9/dog OFFICER yielding no positive results.

148.     MR. RIOU did not consent to LLANES' search or detention of MR. RIOU.

149.     MR RIOU was not free to leave LLANES' confinement and restriction of MR. RIOU to handcuffs nor the back seat of the police car.

150.     LLANES caused other OFFICERS to both search and arrest MR. RIOU without probable cause in reliance on his communication/call for other OFFICERS to assist him, and to also handcuff MR. RIOU, restrict MR. RIOU'S movement and liberty, and to confine MR. RIOU to the back seat of a police car for over an hour, despite neither the human OFFICERS or dog/K-9 OFFICER'S searches yielding no positive results.

151.     MR. RIOU did not consent to search or detention by any of those OFFICERS.

152.     LLANES unlawfully prevented MR. RIOU from leaving the area of the park bench where MR. RIOU was sitting and Alonzo Kelly Park itself and confined MR. RIOU to the park and back of the police car handcuffed pursuant to LLANES' unlawful arrest against MR. RIOU'S WILL and without MR. RIOU'S consent or permission.

153.     In an effort to cover up his illegal use of force, unlawful detention, improper handling of the incident involving a non-threatening eyewitness, and overall gross negligence, Defendant LLANES, with the assistance of other MIAMI PD, exaggerated the facts of the incident that occurred on December 10, 2018.

154.     As a result of the outrageous conduct of Defendant LLANES, Plaintiff MR. RIOU experienced and still experiences loss of dignity, back pain, headaches, anxiety, recurrent nightmares, and required and still requires medical care, new medications, psychiatric/mental health counseling, and has physically relocated from the area of Alonzo Kelly park.

155.     As a further direct and proximate result of Defendant LLANES' conduct, Plaintiff MR. RIOU suffered unlawful arrest and detention, loss of his liberty and freedom, bodily injury and resulting pain and suffering, extreme mental anguish, and medical expenses for treatment and care. These losses are either permanent or continuing, and MR. RIOU will suffer the losses in the future, in violation of his civil rights. MR. RIOU has also agreed to pay the undersigned a reasonable attorney fee for services provided.

156.     WHEREFORE, Plaintiff MR. RIOU prays for the following relief:
   A.     Public apology from Defendant LLANES;
   B.     Immediate expungement of his criminal record created as a result of LLANES' unlawful arrest;
   C.     Trial by Jury;
   D.     Judgment for compensatory damages in excess of $100,000.00;

E.  Judgment for exemplary or punitive damages;
F.  Cost of suit;
G.  Recovery of Attorney fees pursuant to 42 U.S.C. § 1983;
H.  Any other such relief as this Honorable Court deems just and proper.


## COUNT VII
## 42 U.S.C. . § 1983 FALSE ARREST/FALSE IMPRISONMENT CLAIM AGAINST DEFENDANT MIAMI PD [Jorge Colina in his capacity as Chief of Police of the City of Miami Police Department]

157.   Plaintiff MR. RIOU re-alleges the allegations contained in Paragraphs 1 through 83 as if fully set forth herein.

158.   As set forth above, through his direct actions, Defendant LLANES personally participated in and caused the illegal search, false arrest, and false imprisonment of MR. RIOU.

159.   At the time of LLANES' arrest and detention of MR. RIOU, LLANES was employed by MIAMI PD and acting within the scope of LLANES' employment.

160.   LLANES still remains employed by MIAMI PD as an OFFICER today.

161.   LLANES lacked probable cause for both the search and arrest of MR. RIOU.

162.   MR. had not committed a crime.

163.   MR. RIOU was not an ex-felon/felon

164.   MR. RIOU complied with LLANES' order to leave the park.

165.   MR. RIOU did not flee when LLANES approached him.

166.   LLANES observed MR. RIOU for several minutes prior to approaching him and saw MR. RIOU sitting alone on the park bench not bothering anyone nor being a threat to anyone.

167.     Neither the search by the human OFFICERS or dog/K-9 OFFICER yielded any positive results.

168.     LLANES lacked legal authority to arrest or detain MR. RIOU pursuant to his false arrest, handcuffing and detaining  MR. RIOU  for over an hour confined in the back seat of a police car, restricting MR. RIOU'S liberty, freedom, and movements, despite both searches by human OFFICERS and K-9/dog OFFICER yielding no positive results.

169.     MR. RIOU did not consent to LLANES' search or detention of MR. RIOU.

170.     MR RIOU was not free to leave LLANES' confinement and restriction of MR. RIOU to handcuffs nor the back seat of the police car.

171.     LLANES caused other OFFICERS to both search and arrest MR. RIOU without probable cause in reliance on his communication/call for other OFFICERS to assist him, and to also handcuff MR. RIOU, restrict MR. RIOU'S movement and liberty, and to confine MR. RIOU to the back seat of a police car for over an hour, despite neither the human OFFICERS or dog/K-9 OFFICER'S searches yielding no positive results.

172.     MR. RIOU did not consent to search or detention by any of those OFFICERS.

173.     LLANES unlawfully prevented MR. RIOU from leaving the area of the park bench where MR. RIOU was sitting and Alonzo Kelly Park itself and confined MR. RIOU to the park and back of the police car handcuffed pursuant to LLANES' unlawful arrest against MR. RIOU'S WILL and without MR. RIOU'S consent or permission.

174.     MIAMI PD OFFICER presenting himself to MR. RIOU as an OFFICER of supervisory capacity appeared on the scene of MR. RIOU'S arrest on 12/10/18 at Alonzo Kelly Park while the incident was actively in progress.

175.     Prior to Trial, the Prosecutor dropped his formal/filed charge after viewing MR. RIOU'S video of the arrest in the presence of Undersigned Attorney, stating that LLANES "*lacked probable cause*" for the arrest.

176.     MIAMI PD OFFICER failed to utilize his supervisory capacity to stop LLANES' unlawful actions, direct LLANES to release immediately MR. RIOU from police custody and allow MR. RIOU to leave Alonzo Kelly Park, direct LLANES not to charge MR. RIOU, or take any material action within his authority to arrest these unlawful actions by OFFICERS under his supervision.

26

177.     MIAMI PD ratified LLANES' unlawful prevention of MR. RIOU leaving the area of the park bench where MR. RIOU was sitting and Alonzo Kelly Park itself and confined MR. RIOU to the park and back of the police car handcuffed pursuant to LLANES' unlawful arrest against MR. RIOU'S WILL and without MR. RIOU'S consent or permission.

178.     MIAMI PD ratified LLANES and other OFFICER'S conduct and violated MR. RIOU'S constitutional rights by failing to reign in rogue officers, creating an atmosphere that caused LLANES and OFFICERS to feel they have license to use excessive force, effectuate unlawful searches and arrests in the absence of probable cause, and illegally detain people, even handcuffed and for extreme lengths of time, despite those searches yielding no positive results.

179.     MIAMI PD ratified LLANES and other OFFICER'S conduct and violated MR. RIOU'S constitutional rights by failing to reign in rogue officers, creating an atmosphere that caused LLANES and OFFICERS to feel they have license to exaggerate the facts in attempts to cover up illegal and unlawful searches, arrests, and detention, despite being under DOJ oversight and monitoring.

180.     MIAMI PD ratified LLANES and other OFFICER'S conduct and violated MR. RIOU'S constitutional rights by failing to reign in rogue officers, creating an atmosphere that caused LLANES and OFFICERS to feel they have license to exaggerate the facts to create criminal history and charges by falsely charging people with "resisting arrest" to conceal the OFFICER'S unlawful conduct when the underlying arrest was unlawful and/or no probable cause or arrestable offense existed to which the person could have been resisting,  negatively impacting a person's life, liberty, and livelihood with depraved indifference and lack of remorse.

181.     In as much as MIAIMI PD and LLANES knew or should have known that MR. RIOU was a non-threatening eyewitness, especially since he observed MR. RIOU from his police car for approximately six minutes prior to approaching MR. RIOU who was sitting alone on the park bench, LLANES actions when arresting MR. RIOU, in the absence of probable cause or arguable probable cause, were taken without lawful authority. Therefore, said actions constitute the false arrest and false imprisonment of MR. RIOU.

182.     MIAMI PD ratified LLANES' conduct as within the scope of his employment and acceptable conduct for the MIAMI PD by refusing to place LLANES on leave after this incident for which its supervising OFFICER had actual knowledge prior to MR. RIOU'S 03/28/19 complaint; and continuing to refuse to place LLANES on leave after the complaint to date.

183.     MIAMI PD has operated in bad faith and evidence no intent to operate in good faith by delaying its investigation of this matter, not timely responding to Undersigned's calls after the filing of a written complaint against LLANES,  and refusing to place LLANES on leave or remove him from patrolling the communities and engaging the public with the ability to arrest, despite LLANES currently being investigated for excessive use of force by two separate agencies for almost two months.

184.     As a result of the outrageous conduct of Defendant MIAMI PD, Plaintiff MR. RIOU experienced and still experiences loss of dignity, back pain, headaches, anxiety, recurrent nightmares, and required and still requires medical care, new medications, psychiatric/mental health counseling, and has physically relocated from the area of Alonzo Kelly park.

185.     As a further direct and proximate result of Defendant MIAMI PD'S conduct, Plaintiff MR. RIOU suffered unlawful arrest and detention, loss of his liberty and freedom, bodily injury and resulting pain and suffering, extreme mental anguish, and medical expenses for treatment and care. These losses are either permanent or continuing, and MR. RIOU will suffer the losses in the future, in violation of his civil rights. MR. RIOU has also agreed to pay the undersigned a reasonable attorney fee for services provided.

186.     WHEREFORE, Plaintiff MR. RIOU prays for the following relief:
   A.     Public apology from Defendant MIAMI PD;
   B.     Immediate expungement of his criminal record created as a result of LLANES' unlawful arrest;
   C.     Trial by Jury;
   D.     Judgment for compensatory damages in excess of $100,000.00;
   E.     Judgment for exemplary or punitive damages;
   F.     Cost of suit;
   G.     Recovery of Attorney fees pursuant to 42 U.S.C. § 1983;
   H.     Any other such relief as this Honorable Court deems just and proper.


## COUNT VIII
## MALICIOUS PROSECUTION AGAINST DEFENDANT LLANES


187.     Plaintiff MR RIOU realleges the allegations contained in Paragraphs 1 through 83 as if fully set forth herein.

188.    Defendant LLANES wrongfully caused Formal criminal proceedings to be instituted against MR. RIOU with malice and absence of probable cause, or arguable probable cause, by submitting police reports to prosecuting authorities containing false statements and/or material omissions, which reports were relied upon by prosecuting authorities.

189.    Based on the elaborate story and/or police report Defendant LLANES fabricated, the State Attorney's Office filed a criminal charge of Resisting Arrest against MR. RIOU, a 63-year old Veteran retired Army Officer, Minister, and Registered Nurse who had no prior criminal history.

190.    LLANES lacked probable cause for both the search and arrest of MR. RIOU.

191.    Because MR. RIOU has an active professional Registered Nurse's license which he also had at the time of the arrest, LLANES' actions of arresting and causing a charge to be levied against MR. RIOU'S placed MR. RIOU'S Nursing license and livelihood in jeopardy.

192.    LLANES failed to cure or act to cure his actions or pursuit of criminal prosecution against MR. RIOU commenced based on LLANES' report despite multiple opportunities to do so from prior to filing the report all the way to the date of Trial when the Prosecutor officially dropped the charge.

193.    LLANES knowingly allowed the prosecution of his false arrest of MR. RIOU to proceed, not even curing his false arrest or beseeching the Prosecutor to drop the formal charge even after he was subpoenaed as a Trial witness for the Prosecution.

194.    LLANES intended to testify against MR. RIOU at Trial, under oath, to cause MR. RIOU to be incarcerated, all flowing from LLANES' unlawful search, arrest, and detention of MR. RIOU at Alonzo Kelly Park.

195.    Through no effort or assistance of LLANES, these charges were ultimately nolle pross'ed by the State Attorney's Office due to the legal prowess of MR. RIOU'S criminal defense Counsel, the Undersigned Attorney.

196.    The charge was dropped due to lack of probable cause for the arrest.

197.     Therefore, LLANES caused criminal prosecution to be instituted and pursued against MR. RIOU without probable cause, and the proceeding was dismissed in favor of MR. RIOU.

198.     As a result of the outrageous conduct of Defendant LLANES, Plaintiff MR. RIOU experienced and still experiences loss of dignity, back pain, headaches, anxiety, recurrent nightmares, and required and still requires medical care, new medications, psychiatric/mental health counseling, and has physically relocated from the area of Alonzo Kelly park.

199.     As a further direct and proximate result of Defendant LLANES' conduct, Plaintiff MR. RIOU suffered unlawful arrest and detention, loss of his liberty and freedom, bodily injury and resulting pain and suffering, extreme mental anguish, and medical expenses for treatment and care. These losses are either permanent or continuing, and MR. RIOU will suffer the losses in the future, in violation of his civil rights. MR. RIOU has also agreed to pay the undersigned a reasonable attorney fee for services provided.

200.     WHEREFORE, Plaintiff MR. RIOU prays for the following relief:
   A.     Public apology from Defendant LLANES;
   B.     Immediate expungement of his criminal record created as a result of LLANES' unlawful arrest;
   C.     Trial by Jury;
   D.     Judgment for compensatory damages in excess of $100,000.00;
   E.     Judgment for exemplary or punitive damages;
   F.     Cost of suit;
   G.     Recovery of Attorney fees pursuant to 42 U.S.C. § 1983;
   H.     Any other such relief as this Honorable Court deems just and proper.


## <u>COUNT IX</u>
## MALICIOUS PROSECUTION AGAINST DEFENDANT MIAMI PD [Jorge Colina in his capacity as Chief of Police of the City of Miami Police Department]

201.     Plaintiff MR RIOU realleges the allegations contained in Paragraphs 1 through 83 as if fully set forth herein.

202.     Defendant LLANES wrongfully caused Formal criminal proceedings to be instituted against MR. RIOU with malice and absence of probable cause, or arguable probable cause, by submitting police reports to prosecuting authorities containing false

statements and/or material omissions, which reports were relied upon by prosecuting authorities.

203.     LLANES was employed by MIAMI PD at the time of his unlawful conduct and acting within the scope of his employment.

204.     The OFFICERS who assisted LLANES were employed by MIAMI PD at the time of their arrest of MR. RIOU on 12/10/18 and acting within the scope of their employment.

205.     The OFFICER who presented as a Supervisor and with lawful capacity and authority to direct LLANE'S and the other OFFICER'S conduct was employed by MIAMI PD at the time of the unlawful arrest of MR. RIOU and acting within his scope of employment.

206.     Based on the elaborate story and/or police report Defendant LLANES fabricated, which neither the other OFFICERS nor Supervising OFFICER recanted or intervened to stop the arrest or filing of LLANES' police report with the State Attorney's Office, the State Attorney's Office filed a criminal charge of Resisting Arrest against MR. RIOU, a 63-year old Veteran retired Army Officer, Minister, and Registered Nurse who had no prior criminal history.

207.     LLANES lacked probable cause for both the search and arrest of MR. RIOU.

208.     Because MR. RIOU has an active professional Registered Nurse's license which he also had at the time of the arrest, MIAMI PD'S conduct of arresting and causing a charge to be levied against MR. RIOU'S placed MR. RIOU'S Nursing license and livelihood in jeopardy.

209.     MIAMI PD failed to utilize the multiple opportunities it had to cure its unlawful actions through not submitting the police report and/or informing the Prosecutor of the true facts and/or circumstances so that the Prosecutor would not file formal charges.

210.     MIAMI PD knowingly allowed the prosecution of LLANES' false arrest of MR. RIOU to proceed, not even curing LLANES' false arrest or beseeching the Prosecutor to drop the formal charge even after he was subpoenaed as a Trial witness for the Prosecution.

211.    MIAMI PD knowingly allowed the prosecution of his false arrest of MR. RIOU to proceed all the way to the day of Trial, 02/25/19, when the Prosecutor announced on record in Court that he was dropping the charge after having met with Undersigned on 02/18/19 to view MR RIOU'S Discovery video.

212.    MIAMI PD intended to allow LLANES to carry out his intent to testify against MR. RIOU at Trial, under oath, to cause MR. RIOU to be incarcerated, all flowing from LLANES' unlawful search, arrest, and detention of MR. RIOU at Alonzo Kelly Park.

213.    Through no effort or assistance of MIAMI PD, these charges were ultimately nolle pross'ed by the State Attorney's Office due to the legal prowess of MR. RIOU'S criminal defense Counsel, the Undersigned Attorney.

214.    Therefore, MIAMI PD caused criminal prosecution to be instituted and pursued against MR. RIOU without probable cause, and the proceeding was dismissed in favor of MR. RIOU.

215.    MIAMI PD ratified LLANES' conduct as within the scope of his employment and acceptable conduct for the MIAMI PD by refusing to place LLANES on leave after this incident for which its supervising OFFICER had actual knowledge prior to MR. RIOU'S 03/28/19 complaint; and continuing to refuse to place LLANES on leave after the complaint to date.

216.    MIAMI PD ratified LLANES and other OFFICER'S conduct and violated MR. RIOU'S constitutional rights by failing to reign in rogue officers, creating an atmosphere that caused LLANES and OFFICERS to feel they have license to use excessive force, effectuate unlawful searches and arrests in the absence of probable cause, and illegally detain people, even handcuffed and for extreme lengths of time, despite those searches yielding no positive results and MIAMI PD being under active DOJ oversight and monitoring.

217.    MIAMI PD operated in bad faith and evidences no intent to operate in good faith by delaying its investigation of this matter, not timely responding to Undersigned's calls after the filing of a written complaint against LLANES,  and refusing to place LLANES on leave or remove him from patrolling the communities and engaging the public with the ability to arrest, despite LLANES currently being investigated for excessive use of force by two separate agencies for almost two months

218.    As a result of the outrageous conduct of Defendant MIAMI PD, Plaintiff MR. RIOU experienced and still experiences loss of dignity, back pain, headaches, anxiety,

recurrent nightmares, and required and still requires medical care, new medications, psychiatric/mental health counseling, and has physically relocated from the area of Alonzo Kelly park.

219.     As a further direct and proximate result of Defendant MIAMI PD'S conduct, Plaintiff MR. RIOU suffered unlawful arrest and detention, loss of his liberty and freedom, bodily injury and resulting pain and suffering, extreme mental anguish, and medical expenses for treatment and care. These losses are either permanent or continuing, and MR. RIOU will suffer the losses in the future, in violation of his civil rights. MR. RIOU has also agreed to pay the undersigned a reasonable attorney fee for services provided.

220.     WHEREFORE, Plaintiff MR. RIOU prays for the following relief:
   A.     Public apology from Defendant MIAMI PD;
   B.     Immediate expungement of his criminal record created as a result of LLANES' unlawful arrest;
   C.     Trial by Jury;
   D.     Judgment for compensatory damages in excess of $100,000.00;
   E.     Judgment for exemplary or punitive damages;
   F.     Cost of suit;
   G.     Recovery of Attorney fees pursuant to 42 U.S.C. § 1983;
   H.     Any other such relief as this Honorable Court deems just and proper.

## COUNT X
### 42 U.S.C. § 1983 Claim Against Defendant MIAMI PD for Negligent Training and Supervision [Jorge Colina in his capacity as Chief of Police of the City of Miami Police Department]

221.     Plaintiff MR RIOU realleges the allegations contained in Paragraphs 1 through 83 as if fully set forth herein.

222.     Defendant MIAMI PD violated MR. RIOU'S Fourth Amendment freedom from being subjected to excessive force and Fourteenth Amendment substantive due process when it failed to adequately supervise and train its OFFICERS to respond to calls involving non-threatening eyewitnesses.

223.     MIAMI PD is legally responsible for all conduct of its OFFICERS within their scope of employment, which includes arrests.

224.     MIAMI PD, Chief Jorge Colina, in his capacity as Chief of Police for the MIAMI PD, is responsible for its criminal investigations and training of all OFFICERS in MIAMI PD'S Use of Force policy, and implementation of the same.

225.     MIAMI PD is responsible for the conduct and actions of his OFFICERS during the scope of their employment, including the conduct and actions of supervisory OFFICERS, Field Training OFFICERS.

226.     MIAMI PD is responsible for the Internal Affairs department, including investigations and decisions to place OFFICERS on leave during investigations.

227.     MIAMI PD knew its officers had a proven pattern of employing excessive force, utilizing poor tactics when engaging the public, noncompliance with police procedure, and excessive delays in investigating complaints against its officers by virtue of having consented to DOF oversight and monitoring due to these same offenses arising from the DOJ'S extensive review of MIAMI PD'S arrests, files, complaints, investigations, policies, and actual practice.

228.     MIAMI PD was deliberately indifferent to its responsibility, and executed agreement with the DOJ, to adequately prepare its OFFICERS for encounters with non-threatening eyewitnesses and for their interaction with, detention, and arrest of the same.

229.     MIAMI PD knew or should have known that its OFFICERS would routinely encounter nonthreatening eyewitnesses as par for the course and the ordinary custom of business and scope of employment of being a sworn law enforcement officer.

230.     MIAMID PD knew or shown have known that their OFFICERS needed training on how to appropriately use reasonable force, the least amount of force, verbal de-escalation techniques, negotiation techniques, Constitutional protections of citizens during contact with police, definition of probable cause, detention, arrestable offenses, and all other aspects of engaging non-threatening eyewitnesses from prior to contact through termination of contact, including when no use of force necessary.

231.     MIAMI PD was responsible for monitoring the conduct and training of its OFFICERS and ensuring ongoing and additional training, relief from duty, and/or termination was provided to OFFICERS, especially where evidence showed the OFFICER(S) used excessive force.

232.     MIAMI PD was deliberately indifferent to and breached its duty to train and monitor its OFFICERS to prevent unreasonable use of force, excessive force, and unlawful arrests and false imprisonment, especially in situations where no threat to the OFFICER existed and no probable cause existed.

233.     Even supervisory OFFICERS who physically appeared on the scene of active arrests were deliberately indifferent to unreasonable use of force, excessive force, unlawful arrests and false imprisonment, especially in situations where no threat to the OFFICER existed and no probable cause existed, and deliberately indifferent to training OFFICERS in the appropriate use of force or where no force was required when engaging people where no threat existed.  He ratified LLANES' unlawful conduct.

234.     As a result of MIAMI PD'S negligent training and supervision and lack of effective training and supervision, MR. RIOU was battered, handcuffed, physically detained, arrested, and charged with a crime.

235.     As a result of the outrageous conduct of Defendant MIAMI PD, Plaintiff MR. RIOU experienced and still experiences loss of dignity, back pain, headaches, anxiety, recurrent nightmares, and required and still requires medical care, new medications, psychiatric/mental health counseling, and has physically relocated from the area of Alonzo Kelly park.

236.     As a further direct and proximate result of Defendant MIAMI PD'S conduct, Plaintiff MR. RIOU suffered unlawful arrest and detention, loss of his liberty and freedom, bodily injury and resulting pain and suffering, extreme mental anguish, and medical expenses for treatment and care. These losses are either permanent or continuing, and MR. RIOU will suffer the losses in the future, in violation of his civil rights. MR. RIOU has also agreed to pay the undersigned a reasonable attorney fee for services provided.

237.     WHEREFORE, Plaintiff MR. RIOU prays for the following relief:
   A.     Public apology from Defendant MIAMI PD;
   B.     Immediate expungement of his criminal record created as a result of LLANES' unlawful arrest;
   C.     Trial by Jury;
   D.     Judgment for compensatory damages in excess of $100,000.00;
   E.     Judgment for exemplary or punitive damages;
   F.     Cost of suit;
   G.     Recovery of Attorney fees pursuant to 42 U.S.C. § 1983;
   H.     Any other such relief as this Honorable Court deems just and proper.

<u>COUNT XI</u>
<u>NEGIGLENCE BY DEFENDANT CITY OF MIAMI [FRANCIS SUAREZ, IN HIS CAPACITY AS MAYOR]</u>

238.     Plaintiff MR RIOU realleges the allegations contained in Paragraphs 1 through 83 as if fully set forth herein.

239.     Pursuant to Miami City Ordinance Chapter 38-3 (Parks and Recreation):

>      *Except as otherwise provided in this chapter, all municipally owned parks and playgrounds of the city and all similar real property owned by the city, not directly engaged in the operation of facilities which require that the general public have access to such premises during the hours hereinafter recited, shall be closed to the general public from 10:00 p.m. until 7:00 a.m., daily, except when kept open for special events sponsored by, or operated by, the city.*

240.     Pursuant to Miami City Ordinance 38-4 (Notices In Main Entrances),
>      *The police department shall cause proper notice to be placed in the main entrances to the city parks, playgrounds and properties referred to in the preceding section, warning the general public that such properties are closed during the hours therein recited.*

241.     The "Welcome" sign to the park does not list any park hours, and no sign exists at Alonzo Kelly Park warning the public of the park hours.

242.     The "Welcome" sign lists the park as a "Miami-Dade County Park."

243.     CITY OF MIAMI maintains concurrent and supplemental jurisdiction over the park.  Its OFFICERS of the MIAMI PD patrol and effectuate arrests at this park. Defendant LLANES who arrested Plaintiff MR. RIOU at Alonzo Kelly Park works for MIAMI PD.

244.     CITY OF MIAMI, in exercising concurrent and supplemental jurisdiction, breached its duty and failed to post any sign providing notice or warning of hours at Alonzo Kelly Park or to ensure that the MIAMI PD, Miami-Dade County law enforcement, and/or Miami-Dade County posted any signs providing Notice or warning of park hours at the main entrance or in any location at Alonzo Kelly Park.

245.     In breaching its duty to ensure that such signs are posted giving the public notice and warning of operating hours, CITY OF MIAMI created an atmosphere where

deprivation of civil rights by OFFICERS could run rampant through the issuance of unlawful citations, fines, unwelcome and unprivileged physical contact, arrests, orders to vacate the park, detention, and incarceration.

246.      CITY OF MIAMI'S breach was the direct and proximate cause of the deprivation of MR. RIOU'S civil rights and by LLANES and MIAMI PD because LLANES initiated engagement with MR. RIOU by giving an order to leave the park because it was "closed," from which his unlawful arrest and detention of MR. RIOU flowed.

247.      Since MR. RIOU visited multiple parks throughout the city to reflect as he planned his next career in full-time ministry, and those parks he visited which had CITY OF MIAMI posted hours open as "7AM – 10 PM" and those he visited with signs stating "Welcome to Your Miami-Dade County Park" which had a sign providing notice or warning of  park hours as "PARK CLOSED FROM 10:00 PM TO 6:00 AM," the posted notice of open hours were virtually the same for both CITY OF MIAMI and MIAMI-DADE COUNTY., i.e. 7 or 6:01 AM to 9:59 PM.

248.      CITY OF MIAMI knew or should have known that park visitors would reasonably believe that public parks in the city without posted park hours would close at the same time as those with posted hours, where such parks are located in Miami, and policed by MIAMI PD.

249.      Alonzo Kelly Park is one of those parks.

250.      CITY OF MIAMI'S failure to warn or give notice of hours where it has concurrent and/or supplemental jurisdiction, directly and proximately caused MR. RIOU to be in the park at the time of LLANES' unlawful arrest and detention of MR. RIOU. He had no notice if different hours existed for Alonzo Kelly Park which he visited almost every evening since he lived across the street from the park, and thereby no warning or notice so that he could avoid any fines, citations, arrests, incarcerations, orders to leave the park based on park hours.

251.      As a result of CITY OF MIAMI'S breach of its duty, Plaintiff MR. RIOU was arrested by LLANES in Alonzo Kelly Park.

252.      As a result of CITY OF MIAMI'S breach of its duty, Plaintiff MR. RIOU experienced and still experiences loss of dignity, back pain, headaches, anxiety, recurrent nightmares, and required and still requires medical care, new medications, psychiatric/mental health counseling, and has physically relocated from the area of Alonzo Kelly park.

253.     As a further direct and proximate result of CITY OF MIAMI'S conduct, Plaintiff MR. RIOU suffered unlawful arrest and detention, loss of his liberty and freedom, bodily injury and resulting pain and suffering, severe mental anguish, and medical expenses for treatment and care. These losses are either permanent or continuing, and MR. RIOU will suffer the losses in the future, in violation of his civil rights. MR. RIOU has also agreed to pay the undersigned a reasonable attorney fee for services provided.

254.     WHEREFORE, Plaintiff MR. RIOU prays for the following relief:
   A.     Public apology from Defendant CITY OF MIAMI;
   B.     Immediate expungement of his criminal record created as a result of LLANES' unlawful arrest;
   C.     Trial by Jury;
   D.     Judgment for compensatory damages in excess of $100,000.00;
   E.     Judgment for exemplary or punitive damages;
   F.     Cost of suit;
   G.     Recovery of Attorney fees pursuant to 42 U.S.C. § 1983;
   H.     Any other such relief as this Honorable Court deems just and proper.


## COUNT XII
## NEGIGLENCE BY DEFENDANT MIAMI-DADE COUNTY [Carlos A. Gimenez, in his capacity as Mayor of Miami-Dade County]


255.     Plaintiff MR RIOU realleges the allegations contained in Paragraphs 1 through 83 as if fully set forth herein.

256.     Pursuant to Miami-Dade County Ordinance, MIAMI-DADE COUNTY is responsible for maintain its parks, including the posting notice and warning of park hours in a place prominent and visible to the public.

257.     The "Welcome" sign at Alonzo Kelly Park, located in Miami, lists the park as a "Miami-Dade County Park."

258.     The "Welcome" sign to the park does not list any park hours, and no sign exists at Alonzo Kelly Park warning the public of the park hours.

259.     MIAMI-DADE COUNTY maintains concurrent and supplemental jurisdiction over the park with CITY OF MIAMI.   MIAMI PD'S OFFICERS patrol and effectuate arrests at this park.  Defendant LLANES who arrested Plaintiff MR. RIOU at Alonzo Kelly Park works for MIAMI PD.

260.     MIAMI-DADE COUNTY, in exercising concurrent and supplemental jurisdiction, breached its duty and failed to post any sign providing notice or warning of hours at Alonzo Kelly Park or to ensure that the MIAMI PD, Miami-Dade County law enforcement, and/or CITY OF MIAMI posted any signs providing Notice or warning of park hours at the main entrance or in any location at Alonzo Kelly Park.

261.     In breaching its duty to ensure that such signs are posted giving the public notice and warning of operating hours, MIAMI-DADE COUNTY created an atmosphere where deprivation of civil rights by OFFICERS could run rampant through the issuance of unlawful citations, fines, unwelcome and unprivileged physical contact, arrests, orders to vacate the park, detention, and incarceration.

262.     MIAMI-DADE COUNTY'S breach was the direct and proximate cause of the deprivation of MR. RIOU'S civil rights and by LLANES and MIAMI PD because LLANES initiated engagement with MR. RIOU by giving an order to leave the park because it was "closed," from which his unlawful arrest and detention of MR. RIOU flowed.

263.     Since MR. RIOU visited multiple parks throughout the city to reflect as he planned his next career in full-time ministry, and those parks he visited which had CITY OF MIAMI posted hours open as "7AM – 10 PM" and those he visited with signs stating "Welcome to Your Miami-Dade County Park" which had a sign providing notice or warning of park hours as "PARK CLOSED FROM 10:00 PM TO 6:00 AM," the posted notice of open hours were virtually the same for both CITY OF MIAMI and MIAMI-DADE COUNTY., i.e. 7 or 6:01 AM to 9:59 PM.

264.     MIAMI-DADE COUNTY knew or should have known that park visitors would reasonably believe that public parks in the city without posted park hours would close at the same time as those with posted hours, where such parks are located in Miami, and policed by MIAMI PD.

265.     Alonzo Kelly Park is one of those parks.

266.     MIAMI-DADE COUNTY'S failure to warn or give notice of hours where it has concurrent and/or supplemental jurisdiction, directly and proximately caused MR. RIOU to be in the park at the time of LLANES' unlawful arrest and detention of MR. RIOU. He had no notice if different hours existed for Alonzo Kelly Park which he visited almost every evening since he lived across the street from the park, and thereby no warning or notice so that he could avoid any fines, citations, arrests, incarcerations, orders to leave the park based on park hours.

267.     As a result of MIAMI-DADE COUNTY'S breach of its duty, Plaintiff MR. RIOU was arrested by LLANES in Alonzo Kelly Park.

268.     As a result of MIAMI-DADE COUNTY'S breach of its duty, Plaintiff MR. RIOU experienced and still experiences loss of dignity, back pain, headaches, anxiety, recurrent nightmares, and required and still requires medical care, new medications, psychiatric/mental health counseling, and has physically relocated from the area of Alonzo Kelly park.

269.     As a further direct and proximate result of MIAMI-DADE COUNTY'S conduct, Plaintiff MR. RIOU suffered unlawful arrest and detention, loss of his liberty and freedom, bodily injury and resulting pain and suffering, severe mental anguish, and medical expenses for treatment and care. These losses are either permanent or continuing, and MR. RIOU will suffer the losses in the future, in violation of his civil rights. MR. RIOU has also agreed to pay the undersigned a reasonable attorney fee for services provided.

270.     WHEREFORE, Plaintiff MR. RIOU prays for the following relief:
   A.     Public apology from Defendant MIAMI-DADE COUNTY;
   B.     Immediate expungement of his criminal record created as a result of LLANES' unlawful arrest;
   C.     Trial by Jury;
   D.     Judgment for compensatory damages in excess of $100,000.00;
   E.     Judgment for exemplary or punitive damages;
   F.     Cost of suit;
   G.     Recovery of Attorney fees pursuant to 42 U.S.C. § 1983;
   H.     Any other such relief as this Honorable Court deems just and proper


## COUNT XIII

## RACIAL DISCRIMINATION42 U.S.C. § 1983 Claim Against Defendant MIAMI PD [Jorge Colina in his capacity as Chief of Police of the City of Miami Police Department

271.     Plaintiff MR RIOU realleges the allegations contained in Paragraphs 1 through 83 as if fully set forth herein.

272.     Governmental entities including law enforcement do not enjoy qualified immunity for violation of another's constitutional rights based on race.

273.     MIAMI PD is currently under DOJ oversight and monitoring commenced due to its practice and pattern of employing excessive force and unlawful and/or poor tactics against unarmed African-American males.

274.     Accordingly, MIAMI PD has a known and factually and legally proven pattern and practice of policing African-American males different from similarly-situated non-African-American people it arrests.

275.     Accordingly, MIAMI PD was on notice of its disparate and unlawful treatment of unarmed African-American males during stops and arrests, including employing excessive force.

276.     MR. RIOU was an unarmed African-American male falsely arrested, battered, detained unlawfully and without cause, and injured by LLANES conduct, ratified by the MIAMI PD supervisor(s) who appeared on the scene but failed to cure LLANES actions, as well as Internal Affairs and Chief Jorge Colina in behalf of the MIAMI PD who refused to discipline and/or even place LLANES on leave to date while investigating MR. RIOU'S 03/28/19 investigation against LLANES.

277.     The facts of its differential and preferential treatment of non-blacks in its policing have already been proved.

278.     MIAMI PD has consistently and intentionally delayed acting on MR. RIOU'S written complaint against LLANES, including even refusing to place LLANES on leave.

279.     MIAMI PD has consistently and intentionally delayed responding to requests from MR. RIOU of updates on the investigation after the filing of MR. RIOU'S written complaint on 03/28/19.

280.     MIAMI PD ratified LLANES and other OFFICER'S conduct and violated MR. RIOU'S constitutional rights by failing to reign in rogue officers, creating an atmosphere that caused LLANES and OFFICERS to feel they have license to use excessive force, effectuate unlawful searches and arrests in the absence of probable cause, and illegally detain people, even handcuffed and for extreme lengths of time, despite those searches yielding no positive results against blacks because MIAMI PD will be slow to investigate and allow those OFFICERS to remain on duty to endanger the public.

281.     MIAMI PD  operated in bad faith and evidences no intent to operate in good faith nor truly change its pattern of discriminatory treatment of blacks by delaying its investigation of this matter, not timely responding to Undersigned's calls after the filing of a written complaint against LLANES,  and refusing to place LLANES on leave or

41

remove him from patrolling the communities and engaging the public with the ability to arrest, despite LLANES currently being investigated for excessive use of force by two separate agencies for almost two months

282.     As a result of MIAMI PD'S conduct, Plaintiff MR. RIOU experienced and still experiences loss of dignity, back pain, headaches, anxiety, recurrent nightmares, and required and still requires medical care, new medications, psychiatric/mental health counseling, and has physically relocated from the area of Alonzo Kelly park.

283.     As a further direct and proximate result of MIAMI PD'S conduct, Plaintiff MR. RIOU suffered unlawful arrest and detention, loss of his liberty and freedom, bodily injury and resulting pain and suffering, severe mental anguish, and medical expenses for treatment and care. These losses are either permanent or continuing, and MR. RIOU will suffer the losses in the future, in violation of his civil rights. MR. RIOU has also agreed to pay the undersigned a reasonable attorney fee for services provided.

284.     WHEREFORE, Plaintiff MR. RIOU prays for the following relief:
   A.     Public apology from Defendant MIAMI PD;
   B.     Immediate expungement of his criminal record created as a result of LLANES' unlawful arrest;
   C.     Trial by Jury;
   D.     Judgment for compensatory damages in excess of $100,000.00;
   E.     Judgment for exemplary or punitive damages;
   F.     Cost of suit;
   G.     Recovery of Attorney fees pursuant to 42 U.S.C. § 1983;
   H.     Any other such relief as this Honorable Court deems just and proper

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff MR. RIOU respectfully prays that this Court:

   A.     Enter Order declaring that Defendant's acts and conduct constituted violations of the Fourth and Fourteenth Amendments of the U.S. Constitution under 42 U.S.C. §§ 1983.
   B.     Enter Judgment in Plaintiff's favor as to all claims for relief.
   C.     Award compensatory damages for the injuries MR. RIOU sustained due to Defendants' conduct for all economic and non-economic damages for medical costs, pain, suffering, humiliation and emotional distress.
   D.     Award punitive and exemplary damages, pre-judgment interest, post-judgment

interest, costs, and other reasonable expenses incurred in maintaining this action, and the reasonable attorney's fees and costs incurred in maintaining this action.

E.  Award all other relief in law or equity to which Plaintiff is entitled and this Honorable Court deems just, equitable, and proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury on all issues within this Complaint.

Respectfully submitted May 23, 2019

_____

**Rawsi Williams, Esq., R.N.**
Fla. Bar No. 103201
Primary Email:  eservice@rawsi.com
Secondary Email: rawsi@rawsi.com
Rawsi Williams Law Group
Wells Fargo Center
333 SE 2nd Ave., STE 2000
Miami, FL  33131
Tel: 1-888-729-7452 (1-888-RawsiLaw)
Attorney for Plaintiff

## Certificate of Service

I hereby certify that a true and correct copy of the foregoing was served by duly certified process server on May 23, 2019 on all counsel or parties of record on the Service List below.

Rawsi Williams, Esq., R.N.

43

OFFICER IOANNYS LLANES

City of Miami Police Department
C/O Court Liaison or Chief Jorge Colina
400 NW 2nd Avenue
Miami, Florida 33128
Defendant


CITY OF MIAMI POLICE DEPARTMENT

[Jorge Colina, in his official capacity as Chief of the Miami Police Department]
C/O Court Liaison or Chief Jorge Colina
400 NW 2nd Ave
Miami, FL  33128
Defendant


CITY OF MIAMI

[Francis Suarez, in his official capacity as Mayor]
C/O Attorney Ms. Victoria Mendez
City of Miami
Office of the City Attorney
444 S.W. 2nd Avenue, Suite 945
Miami, FL 33130
Counsel for Defendant


MIAMI-DADE COUNTY

[Carlos A. Gimenez, in his official capacity as Mayor of Miami-Dade County]
C/O Attorney Ms. Abigail Price-Williams
County Attorney's Office
111 NW 1st Street, Suite 2810
Miami, Florida 33128
Counsel for Defendant



7J: ;4;F 3

## CASE INFORMATION

**Court Case No.:** M18036741    **State Case No.:** 132018MM0367410001XX

**Name:** JULIEN-RIOU, OSCAR ELVIN    **Date of Birth:** 08/28/1955

**Date Filed:** 12/26/2018    **Date Closed:** 02/25/2019   **Warrant Type:**

**Hearing Date:**    **Hearing Time:**    **Hearing Type:**

**Court Room:** REGJB - JUSTICE BUILDING, ROOM No.: 5-1

**Address:** 1351 N.W. 12 ST

**Previous Case:**    **Next Case:**

**Judge:** SOSA-BRUZON, ELEANE   **Defense Attorney:** WILLIAMS, RAWSI

**Bfile Section:** M007    **File Location:** FILE ROOM   **Box Number:**

## CHARGES

| Seq No. | Charge | Charge Type | Disposition |
|---------|--------|-------------|-------------|
| 1 | RESIST OFF W/O VIOL | MISDEMEANOR | NOLLE PROS |

## DOCKETS:

| Seq. No. | Date | Book/Page | Docket |
|----------|------|-----------|--------|
| 16 | 02/25/2019 | | CLOSING JUDGE SOSA-BRUZON, ELEANE |
| 15 | 02/18/2019 | | E-SUBPOENA: LLANES, IOANNYS ID: 001-42789 FOR: TRIAL ON 02/25/2019 AT 10:15 ISSUED BY: CJIS SENT: 02/18/2019 RECD/NOTFD: 02/18/2019 ACKN: 02/18/2019 M SENT: RECD/NOTFD: 02/18/2019 ACKN: 02/18/2019 M |
| 14 | 02/15/2019 | | INTAKE UNIT ASSIGNED: COUNTY COURT |
| 13 | 02/11/2019 | | NOTICE OF DISCOVERY |
| 11 | 01/30/2019 | | TRIAL HEARING SCHEDULED FOR 02/25/2019 AT 10:15 |

**EXHIB IT B**

| Seq. No. | Date | Book/Page | Docket |
|---|---|---|---|
| 8 | 01/22/2019 | | ARRAIGNMENT SETTING CANCELLED |
| 7 | 01/18/2019 | | DEMAND FOR DISCOVERY |
| 6 | 01/18/2019 | | DEMAND FOR TRIAL BY JURY |
| 5 | 01/18/2019 | | WRITTEN PLEA OF NOT GUILTY |
| 4 | 01/18/2019 | | NOTICE OF APPEARANCE RAWSI WILLIAMS, ESQ. |
| 1 | 12/27/2018 | | DEFN STREET CHANGED BY FINALIST PURSUANT TO CLERK |



# MIAMI POLICE DEPARTMENT
## PROFESSIONAL LAW ENFORCEMENT

Custom Search [GO]

SEARCH

COMMUNITIES    NS DE MPD    SERVICES    JOIN MPD    TRAINING CENTER    SAFETY

MEDIA

**GET HELP**

Dial 911 for EMERGENCIES ONLY

**Miami Police Non-Emergency:** (305) 579-6111

**Crime Stoppers:** (305) 471-TIPS

**Drug Tip Hotline:** (305) 603-6585

**Gang/Graffiti Hotline:** (305) 808-6800

BUYCRASH.COM

National Bike Registry

| | |
|---|---|
| **Reference No:** | W003573-032819 |
| **Contact E-Mail:** | rawsi@rawsi.com |

The City of Miami Police Department takes all complaints against its employees very seriously.

We will be contacting you in the near future to obtain further information in order to proceed with the investigative process.

We thank you for coming forward with your concerns.  If you have any questions, please do not hesitate to contact the Internal Affairs Section at (305) 835-2000, Monday through Friday; the office hours are from 8:00 a.m. to 5:00 p.m.



Powered by GovQA

Copyright © 2013 The City of Miami Police Department. All rights reserved.
This information is made available to the public and law enforcement in the interest of public safety.
Any unauthorized use of this information is forbidden and subject to criminal prosecution.

GZJ ЄD'KV'E

**U.S. Department of Justice**

Civil Rights Division

*Office of the Assistant Attorney General*                    *Washington, D.C. 20530*

'JUL 0 9 2013

**Via Electronic and First Class Mail**

The Honorable Tomas P. Regalado
Mayor, City of Miami
3500 Pan American Drive
Miami, FL  33133

Chief Manuel Orosa
City of Miami Police Department
400 NW Second Avenue
Miami, FL  33128

      **Re:**    **Investigation of City of Miami Police Department**

Dear Mayor Regalado and Chief Orosa:

      This letter reports the findings of the Department of Justice's investigation of the City of Miami Police Department ("MPD") pursuant to the Violent Crime Control and Law Enforcement Act of 1994, 42 U.S.C. § 14141, to determine whether MPD engages in a pattern or practice of excessive use of deadly force by firearms.  Based on our comprehensive review, we find reasonable cause to believe that MPD engages in a pattern or practice of excessive use of force with respect to firearm discharges.  We arrived at this conclusion based on interviews of relevant witnesses; a careful review of MPD policies; reviews of investigative files in connection with incidents of firearms discharges; and reviews of policies and practices related to internal investigations of uses of deadly force.  Among other findings, our investigation uncovered a number of troubling MPD practices, including deficient tactics and supervision, as well as significant delays and substantive deficiencies in deadly force investigations.

      In making these findings, we recognize the challenges that MPD officers confront on a daily basis.  The delivery of police services is a difficult, and often dangerous, job in which the use of force, including the use of deadly force, is sometimes necessary.  By addressing our findings, the City of Miami will not only ensure that its police department operates in a manner consistent with the Constitution, but will improve officer and community safety and increase community confidence.

**EXHI BIT D**

        Between 2008 and 2011, MPD officers intentionally shot at individuals 33 times.[1]  While the number of shootings alone does not itself establish a pattern or practice of unreasonable force, it stands in stark contrast to a 20-month period in 2002-2004 in which there were no MPD officer-involved shootings at persons.

        In addition, MPD has fully investigated only 24 of the 33 shooting incidents between 2008 and 2011, and has allowed multiple investigations to remain unfinished for three years or longer.  Of the 17 shootings from the 2010-2011 period, only 10 have a completed investigation.  MPD itself determined 3 of these 10 shootings were unjustified, including one shooting in which Chief Manuel Orosa reversed the findings of the Firearms Review Board, which had originally found the shooting justified.  Throughout the entire period of our review – 2008 through 2011 – we identified other shootings that appear unjustified and may have resulted from tactical and training deficiencies.

        Finally, a small number of officers were involved in a disproportionate number of shootings.  A combination of seven officers participated in over a third of the 33 officer-involved shootings.  Had the shooting investigations been completed in a timely fashion, corrective action could have been undertaken and may have prevented the harm that can result from officers' repeated shootings, such as injury or death to the officer and/or the subject, trauma to the officer and others, and costly legal settlements, among other types of harm.

        We commend MPD and Chief Orosa, who was sworn in on December 20, 2011, for recognizing some of the problems we found and pursuing initiatives to address them, such as those laid out in Chief Orosa's July 2012 written response to our investigation, which include the restructuring of the Tactical Operations Section, improvements to community relationships, establishment of a Professional Compliance Section, the proposed creation of a Major Case Team to investigate officer-involved shootings, and changes to the case review process in Internal Affairs, among others.  We look forward to continuing our collaborative relationship with MPD in crafting and implementing sustainable reforms.  Our review benefited from the productive dialogue we have had with MPD supervisors and officers, City of Miami officials, the Civilian Investigative Panel, and members of the Miami community.

        Although we appreciate the cooperation and professionalism that MPD personnel demonstrated during the investigation, our ability to complete the investigation was delayed by MPD's frequent inability to produce necessary documents in a timely fashion.  Delays in production were partly attributable to the fact that so many internal investigations were long overdue and could not be reviewed until completed.  For example, despite repeated requests beginning from our first document request dated December 9, 2011, and follow-up requests dated July 20, 2012, September 20, 2012, and November 1, 2012, we still have not received the complete file for all of the shootings files we requested.  It took months for us to receive other shooting investigation files we requested.  More timely investigations, better investigative tracking and effective accountability measures would help MPD to prevent such internal delays and would likely reduce the number of officer-involved shootings going forward.

---

[1]        This includes shootings that resulted in both fatal and non-fatal injuries and those in which an officer fired but missed.  We reviewed all shootings for which MPD provided documentation.

## I.    BACKGROUND

This is the second time that the Department of Justice has had cause to investigate MPD in about a decade.  Our first investigation, which began in May 2002, was predicated on allegations that officers used excessive deadly and non-deadly force.  In the year prior to commencing that investigation, thirteen MPD officers were indicted on conspiracy charges for lying and planting physical evidence, including guns, in an effort to undermine the investigations of four officer-involved shootings.  The indictments implicated officers at various levels of the chain of command, including supervisory staff, and resulted in six convictions.  Then-Mayor Joe Carollo and Chief Raul Martinez, who was shortly thereafter succeeded by Chief John Timoney, requested a federal investigation of the department when the indictments became public.  During the course of that investigation, we inspected MPD operations on four occasions, reviewed numerous policies and case files, interviewed members of the community and MPD staff, and provided detailed technical assistance.

We did not find a pattern or practice of excessive force in officer-involved shootings during the first investigation, but we uncovered serious deficiencies in MPD's investigative practices and observed that officers' use of deadly force was sometimes avoidable.  MPD investigators routinely failed to pursue inconsistencies in officer or witness accounts, and left glaring omissions unexplored.  The presence of conflicting statements and omissions, left unresolved by investigators, raised serious questions about the usefulness of the investigations and MPD's ability to discern what actually happened.  In some cases, investigators also failed to question apparent breaches of the chain of custody of key evidence, such as a subject's gun.  We concluded that MPD's failure to thoroughly investigate shootings, like the deficiencies we found in investigations of other types of uses of force, led to dubious internal conclusions about the appropriateness of force.  These deficiencies led to a heightened risk that MPD officers would use force, including deadly force, excessively.

Although MPD demonstrated a willingness to address our concerns in several areas, a significant number of troubling uses of force occurred after our March 2003 technical assistance letter.  In a follow-up technical assistance letter in January 2006, we recommended that MPD improve accountability by modifying its policies and training to require, among other things, more diligent and thorough investigations by supervisors.  We recommended that MPD improve training for line supervisors and Internal Affairs investigators in interview techniques, assessing the credibility of witnesses, and impartiality in the interview process.  We recommended that training emphasize that investigators should consider all relevant evidence, including circumstantial, direct, and physical evidence, as appropriate, in making credibility determinations.

In response to our technical assistance, MPD revised its policies, procedures and practices to ensure that every use of force is reported and adequately investigated.  MPD made important changes to its policies that significantly restricted the use of deadly force, resulting in a 20-month period between December 2002 and September 2004 when no MPD officer discharged his or her firearm at anyone.  We attributed this dramatic improvement to changes in policies and

procedures, increased accountability, and increased supervision within the specialized units, such as SWAT and the Problem-Solving Teams.  Accordingly, we closed the investigation without a formal agreement in 2006.

Our current investigation commenced on November 16, 2011, after MPD officers fatally shot seven young African-American men during an eight-month period spanning 2010 and 2011. The shootings gave rise to widespread community concern about MPD's use of deadly force and led to multiple requests for a Department of Justice investigation.  Like the prior investigation, the current investigation also arose during a wave of corruption allegations involving sworn MPD officers and supervisors, including allegations of extortion and obstruction of justice.

This investigation was a joint effort of the Civil Rights Division and the United States Attorney's Office for the Southern District of Florida.  We conducted our investigation with the assistance of a police practices use of force expert who assisted us during our prior investigation. We reviewed approximately 17,000 documents, including forensic reports, investigative reports, transcripts, photographs, recordings, policies and procedures, and training materials.  We also interviewed Chief Orosa, MPD command staff, homicide detectives and sergeants, Internal Affairs personnel, and representatives from the Fraternal Order of Police.  In addition, we met with citizens' groups, other community leaders and victims' family members.

## II.    APPLICABLE LEGAL STANDARDS

Section 14141 authorizes the United States to file a legal action when it has reasonable cause to believe that a law enforcement agency engages in a pattern or practice of violations of the Constitution or laws of the United States.  For a court to find a pattern or practice, it does not need to find a set number of incidents or acts.  *See United States v. W. Peachtree Tenth Corp.*, 437 F.2d 221, 227 (5th Cir. 1971) ("The number of [violations] . . . is not determinative . . . . In any event, no mathematical formula is workable, nor was any intended.  Each case must turn on its own facts").  A pattern or practice may be found by examples representing typical conduct, as opposed to isolated instances.  *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 336 n.16 (1977) (noting that the phrase "pattern or practice" "was not intended as a term of art," but should be interpreted according to its usual meaning "consistent with the understanding of the identical words" used in other federal civil rights statutes).

Courts analyze Fourth Amendment claims of excessive force, deadly or not, under the Supreme Court's objective reasonableness standard.  This standard weighs the level of force used by an officer against: 1) the severity of the crime; 2) the immediacy of the threat posed by the suspect; and 3) whether the suspect sought to evade or resist arrest.  *Graham v. Connor*, 490 U.S. 386, 396 (1989); *Scott v. Harris*, 550 U.S. 372, 382-84 (2007); *see also Priester v. City of Riviera Beach, Fla.*, 208 F.3d 919, 924 (11th Cir. 2000); *Crenshaw v. Lister*, 556 F.3d 1283, 1290 (11th Cir. 2009).  Police should also provide a warning, if feasible, before using deadly force.  *Tennessee v. Garner*, 471 U.S. 1, 11-12 (1985).  A police officer may not use deadly force against an unarmed and otherwise non-dangerous subject, s*ee Garner*, 471 U.S. at 11, and not every situation involving an armed subject calls for the use of deadly force.  *Graham*, 490 U.S. at 396-97; *Pablo Hernandez v. City of Miami,* 302 F.Supp.2d 1373, 1376-80 (S.D. FL 2004).  In the case of fleeing suspects, a law enforcement officer may use deadly force if he or she "(1) 'has

probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others' or 'that he has committed a crime involving the infliction or threatened infliction of serious physical harm'; (2) reasonably believes that the use of deadly force was necessary to prevent escape; *and* (3) has given some warning about the possible use of deadly force, if feasible." *McCullough v. Antolini*, 559 F.3d 1201, 1206 (11th Cir. 2009) (quoting *Vaughan v. Cox*, 343 F.3d 1323, 1329-30 (11th Cir. 2003) and *Garner*, 471 U.S. at 11-12); *see also Scott*, 550 U.S. at 382 n.9 (2007) (explaining that *Garner's* use of "to prevent escape" was merely an application of the main prong which is "to prevent serious physical harm").

The deadly force analysis requires a balancing of the nature and quality of the intrusion on the individuals' Fourth Amendment interests against the interests of the government, which include protecting the safety of the involved police officers as well as the public at large. *See Mercado v. City of Orlando,* 407 F.3d 1152, 1157 (11th Cir. 2005). Courts consider the reasonableness of an officer's use of force through a fact-dependent inquiry that is based on the totality of the circumstances. "[T]he question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Graham*, 490 U.S. at 397; *see also Fils v. City of Aventura*, 647 F.3d 1272, 1288 (11th Cir. 2011) (engaging in a fact-intensive inquiry of the circumstances confronting officers prior to use of force to assess reasonableness).

## III.    FINDINGS REGARDING USE OF DEADLY FORCE

We find that MPD engages in a pattern or practice of excessive force with respect to firearms discharges, in violation of the Fourth Amendment to the United States Constitution and Section 14141. In 2006, we closed our first investigation confident that MPD had adopted and implemented the reforms necessary to ensure constitutional policing, as well as a system of accountability to ensure that those reforms would endure. Unfortunately, many of the systemic problems we believed were fixed have reoccurred, evidenced by a steady rise in officer-involved shootings.[2] As detailed further below, MPD itself recently found three of these shootings unjustified, and we found that a number of additional shootings were questionable at best. Many arose as a result of tactical and/or operational deficiencies, and opportunities to learn from these deficiencies were squandered by inadequate and untimely investigations. While the significant decrease in the number of shootings in 2012 while under increased public scrutiny indicates that MPD may be capable of addressing this problem,[3] it also underscores that the previous spike in officer-involved shootings may have been avoidable, and that continued, court-enforceable oversight is necessary to ensure lasting reforms.

---

[2]     There were no shootings in 2003, two in 2004, four in 2005, one in 2006, seven in 2007, eight in 2008, eight in 2009, eight in 2010, and nine in 2011.

[3]     There were four shootings in 2012.

**A. The City of Miami Police Department Has Engaged in a Pattern or Practice of Excessive Force in Officer-Involved Shootings at Persons**

### 1. MPD Itself Found that Officers' Use of Force Was Unjustified in Three Cases

In the past three years, MPD has found at least three officer-involved shootings unjustified.  In one case, MPD terminated the officer after he killed an unarmed motorist and wounded an unarmed passenger in 2011.  MPD rejected the shooting officer's statement that he saw a dark object in the driver's hand that appeared to be a weapon.  MPD also appeared to credit a witness's account that the passenger complied with the officer's demands to show his hands.  Notably, the shooting officer was also involved in a non-shooting role in a 2008 shooting that is still under investigation.  Had MPD fully investigated the 2008 shooting, perhaps retraining or other corrective action may have been taken which could have influenced whether the 2011 shooting had to occur.

In the second case, MPD disciplined an officer after the officer shot at a motorist who reached into his back pocket to retrieve his wallet after the officer requested identification.  The Firearms Review Board voted 4-1 that the shooting was justified.  The dissenting Firearms Review Board member noted that (1) the officer should have anticipated that the driver would reach into his rear pocket to get identification; and (2) it was questionable that the officer gave several commands as he claimed.  Chief Orosa overruled the Firearms Review Board to find the shooting unjustified.

In the third case, MPD disciplined an officer after the officer shot several times at a subject in a fleeing vehicle.  The officer had witnessed the subject repeatedly shoot another man in front of a building before the subject turned the gun towards the officer and then entered a vehicle and fled.  The Firearms Review Board found that the officer was unjustified in delivering the last of several shots since the car was fleeing and there was no longer an imminent threat to the officer.  It is extremely dangerous to shoot at a moving vehicle and the practice is prohibited by policy in many departments.  Should the driver become incapacitated; he or she could lose control of the vehicle creating a serious risk of harm to bystanders.

MPD's own finding of a 13% unjustified shooting rate (3 of the 24 completed investigations) is one factor underlying our determination of a pattern or practice of unconstitutionally excessive deadly force.  Throughout the entire period of our review – 2008 through 2011 – we identified other shootings that appear unjustified and may have resulted from tactical and training deficiencies.  In order to ensure that the use of deadly force by law enforcement officers is constitutional and limited, an agency must maintain clear policies and procedures, require effective training, provide close supervision, hold individuals accountable for their actions, and ensure complete, objective and timely investigations of uses of force.  Further, an agency must ensure that the lessons learned in shootings reviews about training, tactics, equipment and policy actually result in changes to policy, training and practice, if warranted.  MPD's deficiencies in these areas have created an environment in which unnecessary harm occurred, and in which the threat of future unnecessary harm persists.

## 2.  MPD Officers Routinely Employ Poor Tactics

Many of the shooting investigations that we reviewed, including those that did not involve officers from specialized units, revealed poor tactical decisions by officers.  MPD's own review of some of these incidents recognized deficiencies such as poor marksmanship, shooting from too great a distance, failure to follow perimeter protocol, and firing at a moving vehicle.  In other incidents, though, as described below, we found other serious deficiencies that MPD did not find.  In addition to increasing the likelihood that officers will use deadly force unnecessarily, tactical deficiencies can endanger the lives of officers and bystanders.

On multiple occasions, we found that officers failed to await backup before engaging a subject known to be possibly armed, thereby placing themselves and civilians in danger.  In one case, an officer conducted a felony stop in a busy traffic intersection when he had reason to believe that the subject was armed.  Numerous civilians were in the vicinity as the officer and subject subsequently exchanged gunfire, exposing civilians to grave potential harm.  The officer should have waited for backup and attempted to conduct the stop in an area with less civilian activity.  In another case, an officer apparently entered a dark building alone in search of an unknown and unarmed subject, who was ultimately shot by the officer.  The circumstances of the search did not present an immediate risk to the public that necessitated entry without backup.  The officer had no information about whether or not the subject was armed prior to entering the building and placed himself at significant risk of harm by proceeding without assistance.

There were several incidents where officers fired their weapons without sufficient regard for potential risks to the community.  MPD noted some incidents where officers' marksmanship was questionable or where officers fired from too great a distance to assure accuracy.  Our review noted several reports of officers' bullets being lodged in the homes and vehicles of bystanders.  Stray bullets can be lethal to innocent bystanders, but the conduct of officers in several cases suggests that this risk is not recognized as an important tactical consideration.  In one case, an officer chasing a subject fired numerous shots into a dark alley that was surrounded by homes, but investigators apparently could not determine the terminus for most of the shots.  In another case, an officer fired at a moving vehicle in a populated area after the risk of danger posed by the driver had abated.  These examples present very real dangers that should require MPD to demand restraint when officers use deadly force.

We were also concerned that officers failed to avail themselves of feasible lower-force options before shooting at someone, especially in cases involving persons in obviously compromised mental states or persons with mental illness.[4]  In one example, officers entered the residence of a possibly armed subject without backup.  The subject was clearly inebriated, stumbling, and moving slowly.  The subject approached the officers while armed with a knife and was shot.  At least one other officer-involved shooting involved similar facts, in which the officers may have been able to maintain a safer distance between themselves and the subject, thereby reducing risk of harm to themselves, if they had waited for backup and used less-lethal options that were available to them at the time.  In another case, a man known by MPD to have

---

[4]      On September 12, 2012, we similarly found that the Portland Police Bureau (Oregon) engaged in unnecessary or unreasonable force during interactions with people who have or are perceived to have mental illness. (http://www.justice.gov/crt/about/spl/documents/ppb_findings_9-12-12.pdf).

mental illness was shot after he lunged at officers with a broken bottle. Numerous officers unnecessarily surrounded the man, escalating the situation, while a member of the Crisis Intervention Team (CIT) was attempting to speak with him. When the large number of officers surrounded the man and unsuccessfully attempted to deploy an electronic control device, they negated efforts by the CIT officer to de-escalate the situation towards a non-violent outcome. Although MPD had a CIT officer on the scene, unlike other cases involving persons with mental illness, the supervising officers failed to control the scene so that the CIT officer could do his job. An alternative approach prioritizing de-escalation techniques might have eliminated the need to use deadly force. Frequently, the failure of supervisors to command and control the scene in this and other deadly force incidents fostered poor tactical choices by the officers.

Given the poor tactics and inadequate investigative practices apparent in our review of shootings, we expected to see more personnel receive retraining. We are aware of few shooting cases where retraining was recommended at the conclusion of an investigation. Similar to what we observed during our first investigation, the failure to recognize poor tactical choices and require remedial training is partly the result of problematic investigative processes that conceal, if not ignore, deficiencies. This lack of retraining, alongside an ongoing pervasive use of poor tactics, suggests that inadequate tactical training and policy deficiencies may be contributing to avoidable uses of force.

### 3.   Improper Actions by Specialized Units

Several shootings involved officers from MPD's specialized units, including the Tactical Robbery, Crime Suppression, Special Operations, Canine, and Gang Units. In 2008 and 2009, 3 out of 16 shootings involved an officer from a specialized unit, whereas 9 out of 17 shootings that occurred in 2010 and 2011 involved these officers.

Despite written MPD policy requirements, we found that specialized units do not always strictly adhere to operational plans. In one case, for example, a team of officers in a specialized unit improperly deviated from the requirements of a tactical plan. Using unmarked vehicles, the officers diverted from a plan in which they were only to provide particularized assistance when requested and, instead, followed a young man walking on the street. The officers ultimately shot the man, who had been carrying a gun. As noted above, not every situation involving an armed subject excuses the use of deadly force. *Graham*, 490 U.S. at 396-97. Here, the officers relied upon questionable grounds to initially approach the man, as they had no basis to believe that the subject was armed. Moreover, the officers' statements regarding whether or not they actually identified themselves as police officers and issued a verbal warning before shooting are, at best, uncertain. *See Garner*, 471 U.S. at 3 (finding that even in situations where deadly force may be justified, a warning should be given, if feasible).

Our review of completed shooting investigations raised several additional concerns about the role of specialized units. In several of the incidents, there were no marked police vehicles involved in the initial felony stops, and officers who participated in the related shootings and arrests were not immediately recognizable as officers. When unmarked vehicles are not immediately identifiable as police vehicles, and officers are not immediately identifiable as officers, confusion can lead to dangerous actions by officers, subjects and bystanders. The

potential dangers in MPD's practices are compounded by weak tactical planning, failures in after-incident analysis of tactical operations, and inadequate supervision of officers in the specialized units. Behaviors exhibited by some members of specialized units also suggest a lax recruitment process that insufficiently vets officer suitability for assignment to the units. We understand that MPD reduced the size of some of the specialized units in 2012 and returned a number of officers to patrol, ostensibly reducing the number of officers a single supervisor must manage, and we concur with this decision.

### B. MPD's Investigations of Officer-Involved Shootings Are Inadequate

In order to maintain an effective system of officer accountability, use of force investigations must be timely and thorough. An effective accountability system ensures that problematic conduct is identified and effectively remediated at all levels within a police department, from the actions of an individual officer to department-wide operations. MPD's failure to timely and thoroughly investigate officer-involved shootings undermines accountability and unnecessarily exposes the community and officers to risk. This is especially true where an officer is involved in multiple shootings, as is the case with several MPD officers. During our February 2012 tour and later meetings, MPD command staff acknowledged problems with the timeliness and quality of its officer-involved shooting reviews.

#### 1. Outcomes of Shooting Investigations Are Unreasonably Delayed

Our investigation revealed that there are often egregiously long delays in concluding administrative investigations of officer-involved shootings. To date, to our knowledge, MPD has completed only 24 internal investigations for the 33 officer-involved shootings that are the subject of our investigation. Thus, for almost a third of the shootings, MPD has not reached a conclusion internally as to whether or not the officer's firearm discharge was within policy. In some cases, the investigations have remained open for more than three years.

One of the most troubling delays involves a fatal 2009 shooting in which the only living witnesses are the shooting officers. More than three years after the incident, the involved officers still have not provided statements about what transpired during the shooting. The Office of the State Attorney ("SAO") has been unable to evaluate the officers' criminal culpability in the case, and without SAO's official decision to decline prosecution, MPD has decided not to compel the officers to provide statements in order to resolve its internal administrative investigation. This type of delay is unfortunately not uncommon in MPD. Among the closed investigations, at least two remained open for more than three years before reaching a conclusion, and one open shooting investigation has been pending for more than five years.

MPD recently terminated an officer, albeit almost two years after the shooting occurred, for an unjustified shooting in which an unarmed man died and another was wounded. We note further that 4 of the 17 total discharges for 2010 and 2011 involved officers who have since been arrested, indicted, or convicted of crimes unrelated to the shootings. Yet, two of those four shooting investigations are still pending.

These delays prevent prompt corrective action and cause possible policy, training, or equipment deficiencies to remain uncorrected for months or even years, compromising officer safety, opening MPD to potential liability, and increasing the likelihood that avoidable shootings may continue to occur. Such lengthy delays also prolong stress for employees, victims and their families awaiting administrative outcomes and diminish the public's confidence in MPD's ability and willingness to be held accountable.

As further evidence of the importance of timely investigations, we also observed that a combination of seven officers participated in over a third of the 33 officer-involved shootings we reviewed. All seven officers – four of whom were members of specialized units – intentionally discharged their weapons at individuals on multiple occasions over the course of four years. One officer discharged his weapon in four separate incidents during a three-year period, resulting in three deaths, and two of the four discharges are still under investigation. Another officer fatally shot two suspects in separate incidents within a two-week period, and both of those investigations are still pending after more than two years.

The fact that an officer is involved in repeat shootings does not establish whether the deadly force used was unjustified, but it should raise concerns for agency leadership. Yet despite the large number of officers involved in multiple shootings, MPD shooting investigations continue to be delayed significantly. Such delay means that MPD is unable to provide timely and specific feedback or discipline to the involved officer. At least two of the seven officers shot and killed a suspect while still under investigation for a previous discharge. In almost all law enforcement agencies around the country, immediately following a shooting, an officer is removed from the street and placed on administrative duty. In MPD, this reassignment is very brief and the officer is returned to street duties long before – sometimes years before – any determination is made about the propriety of the shooting. MPD also apparently does not consider an officer's record of alleged or substantiated misconduct, including past shootings, as a reason to expedite review of a shooting incident. Given the frequency of shootings among a small subset of officers, combined with the number of recent "unjustified" determinations by MPD, the possible safety consequences of MPD's investigative delays are extremely significant.

MPD's policies should but do not include specific timelines for completing shooting investigations, to assist MPD's ability to prevent future shootings and to ensure that MPD can hold officers accountable for misconduct. State law requires that an officer be notified of disciplinary action within 180 days of an incident of misconduct. If notification occurs after the 180-day deadline, MPD risks being precluded from imposing discipline upon the officer. Although the pendency of a criminal investigation tolls the limitation period (*Fl. St.* § 112.532(6)(a)), we uncovered several pending and completed investigations in which MPD failed to determine disciplinary outcomes even 180 days *after* the SAO's criminal investigation ended. Assuming that the pendency of a criminal investigation is the only condition that may have tolled the statutory period for the cases under our scope of review, MPD may be barred from imposing discipline in approximately one-third of the shootings, even where it finds that the shooting was unjustified. By rendering disciplinary action impossible, MPD loses an essential tool in its system of accountability.

Confusion about how MPD's investigative units – Homicide and Internal Affairs – work together on shooting investigations may also contribute to the extensive delays we observed, as well as compromise investigative outcomes. In practice, it is unclear which unit is responsible for leading shooting investigations despite written policy guidelines. In one disturbing case, for example, investigators from Internal Affairs were prohibited by Homicide from being present when *any* statements were taken from the shooting officer or any witnessing officers, despite the fact that Internal Affairs was generally supposed to lead shooting investigations. MPD policy and practice should clearly delineate the respective responsibilities of the Homicide and Internal Affairs units in order to preserve the integrity of parallel criminal and administrative investigative processes, ensure objective fact-gathering, and assign responsibility for delayed outcomes.

We recommend that all involved entities coordinate efforts to ensure investigative tracking and timely outcomes. Based upon the documents we received from MPD, and the apparent difficulty that MPD encountered in locating some of the investigative materials, it appears that the system used for tracking use of force investigations in general is not used to track investigations of officer-involved shootings. We further recommend that MPD establish a reliable system for tracking the status of investigations and organizing relevant investigative materials.

### 2. Shooting Investigations Fail to Adequately Analyze and Explore Facts to Determine Whether a Shooting is Justified

As noted in our summary of the 2002 investigation, MPD has a history of conducting inadequate force investigations. Unfortunately, the troubling trends that emerged in our review of the completed shooting investigations this time are almost identical to the problems that we identified in our previous investigation. For example, we found that the files for recently completed investigations revealed little administrative or operational analysis by MPD. As a consequence, the opportunity to learn from an incident and apply lessons learned to future incidents, at both the individual and departmental levels, was lost. Administrative reviews became progressively less thorough over the period we analyzed, and MPD failed to address how the incidents and their investigations affected the department's relationship with the community.

In many of the investigative interviews of involved officers, we found that investigators did not sufficiently probe the officers' statements of events to determine if force was necessary and whether less-lethal options were available. Frequently, investigators asked leading questions and did not properly follow up on the answers. Investigators also failed to probe important details, such as whether the officer had attempted de-escalation techniques, and the relative physical positions of the officer and subject at the time of the shooting. These failures were especially troubling in cases where there were inconsistencies between shooting officers' statements, the statements of other officers, and the physical evidence. For those officers in the specialized units who were involved in shootings, investigators and reviewers did not always consider the units' operational policies or relevant after-action reports in evaluating the incidents.

Our review also revealed some disturbing lapses and omissions by MPD investigators. In one investigation, for example, multiple civilian witnesses alleged that officers involved in a

fatal shooting exhibited questionable behavior prior to the shooting.  Despite physical evidence at the scene that partly corroborated the civilians' allegations, investigators did not mention the physical evidence in written reports or ask any of the involved officers about the allegations or physical evidence in their sworn statements, ignoring a relevant part of the investigation.  In another example, officers failed to adequately preserve the shooting scene so that investigators could accurately determine the locations of the shooting officer, the subject and physical objects in close proximity at the time of the discharge.  Even with the incomplete evidence that was preserved in that case, a laboratory analysis based upon photos of the scene appears to suggest that MPD failed to provide the lab with the entire set of photos that it had collected, and therefore the lab may have reached an erroneous conclusion because of the omitted photos.  It is impossible to have accurate and thorough internal investigations with such lapses and omissions.

Finally, we found that MPD does not adequately or timely capture the shooting officer's version of events, in two ways.  First, in some of the earlier cases we reviewed, we found that MPD would complete an administrative investigation with the single exception of taking the shooting officer's statement, which would be taken as soon as the SAO declined to prosecute the officer.  MPD routinely treats these statements as involuntary pursuant to its unnecessarily restrictive interpretation of *Garrity v. New Jersey*, 385 U.S. 493 (1967).  *Garrity* is intended to apply narrowly to situations where the officer is required to give a statement or face termination, and the officer reasonably believes that the statement could be self-incriminating.  It is not meant to apply to officers' routine documentation of their activities, including, for example, the completion of incident and use of force reports, or to discussing the same with department officials.  *E.g., United States v. Camacho*, 739 F. Supp. 1504. 1521 (S.D.Fla.1990) (noting that "the mere fact that the Defendants may have felt compelled to give a statement at the scene to their colleagues and superiors as a normal part of their duties as police officers is not enough to invoke *Garrity*").[5]

We recommend that MPD policy be revised to provide shooting officers the opportunity to give voluntary statements as soon as practicable after each shooting, but in any case within no more than 24-48 hours, absent exigent circumstances.  MPD may also determine that compelled statements are appropriate if the Chief so decides after consultation with the SAO.  MPD policy and practice should give the Chief the opportunity to compel statements if doing so will not interfere with any pending criminal investigation.  Second, it appears that MPD has no mechanism to obtain a public safety statement from the officer immediately after a shooting.  We recommend that MPD have a policy regarding the provision of a brief public safety statement immediately following a shooting, but in any case no later than the end of the officer's tour of duty, absent exigent circumstances.

---

[5]     On November 23, 2011, we provided comprehensive technical assistance to the Seattle Police Department regarding *Garrity* protections.  Our Seattle Police *Garrity* technical assistance letter may be useful to MPD as well. http://www.justice.gov/crt/about/spl/findsettle.php#police

## III.   CONCLUSION

As noted above, we are encouraged that, since we opened our investigation and conducted on-site debriefings, MPD implemented or intends to implement certain changes to address problems with officer-involved shootings. We further note that the total number of shootings decreased significantly in 2012 to almost half of the total for each of the preceding four years. Recent reviews also appear to be more thorough and propose remedial actions to address errant conduct. However, given the fact that this is our second investigation of MPD within the last twelve years, and the fact that many of the deficiencies that we previously uncovered now appear to be deeply rooted, we are concerned about the sustainability of these recent changes.

We are reminded of the fact that, in 2006, we commended MPD for implementing some of the policy reforms that we suggested in 2003. We were hopeful at that time that the reforms were laying the foundation for the practice of constitutional policing in the City of Miami. However, the series of shootings that prompted our present investigation, and the findings we have made here, make clear that some of the problems are still entrenched. Our first investigation of MPD came after highly publicized incidents of MPD officers engaging in excessive force and corrupt conduct. Our second investigation has revealed systemic concerns about MPD's use of deadly force and comes amid another round of highly publicized allegations of corruption within the ranks of MPD.

We are hopeful that we can collaborate in the immediate future to craft and implement court-enforceable, sustainable remedies to correct the deficiencies we have identified. Please note that this findings letter is a public document and will be posted on the Civil Rights Division's website. The DOJ attorneys assigned to this investigation will be contacting the City's attorneys to discuss this matter in further detail. If you have any questions regarding this letter, please contact Jonathan Smith, Chief of the Civil Rights Division's Special Litigation Section, at (202) 514-5393.

Sincerely,

Thomas E. Perez
Assistant Attorney General

cc:   Julie O. Bru
      Office of the City Attorney
      444 SW 2nd Avenue, Suite 952
      Miami, FL  33130

George Wysong
Office of the City Attorney
400 NW 2d Avenue
Miami, FL 33128

(via Electronic Mail)

Wifredo A. Ferrer
United States Attorney
Southern District of Florida
99 N.E. 4th Street
Miami, FL 33132

(via Electronic Mail)